200 So. 404

## PETERS v. STATE.

### I Div. 78.

Supreme Court of Alabama.

Feb. 13, 1941.

Thos. S. Lawson, Atty. Gen., and Prime F. Osborn, Asst. Atty. Gen., for the State.

D. R. Coley, Jr., of Mobile, for appellant.

BROWN, Justice.

The appellant was indicted for murder in the circuit court of Mobile County, the indictment charging that he "unlawfully, and with malice aforethought, killed Mittie Peters, alias Mittie Whitehurst by shooting her with a pistol."

On his trial he pleaded "not guilty" and "not guilty by reason of insanity." The trial resulted in a verdict of murder in the first degree fixing the punishment at death.

The deceased was formerly the defendant's wife from whom he was divorced in a proceeding which he procured to be filed in her name. To quote from the brief in his behalf: "Shortly before the killing he had employed an attorney to secure for him a divorce from his wife, the deceased, on the ground of adultery. His Attorney advised him that after talking to the deceased, that the deceased would contest the divorce on the grounds of adultery and that if he, the defendant, would authorize him to do so he would file the divorce in the name of the deceased and against the defendant, and would secure a divorce more readily, and that he authorized this to be done, and it was done."

The evidence is without dispute that the decree of divorce was granted Saturday, May 6, 1939, and on the same date, after the divorce was granted, the defendant married another woman, and on the Monday following the defendant shot deceased several times with a pistol, inflicting mortal wounds causing instant death.

The evidence offered by the State goes to show that the defendant armed himself with a pistol loaded in every chamber, carrying extra ammunition in his pocket, went to the "Union Tavern" located on Royal and Adams Streets, in the City of Mobile, operated by one of deceased's brothers, where she lived and worked, and where her mother, Minnie Whitehurst, also lived, and there waited until deceased drove up in an automobile, when defendant pulled the pistol and shot and wounded Minnie Whitehurst, and then turned on Mittie Whitehurst, who was not armed, pursued her up the street, shot her down, and stood over her and shot her in the head. Previous to the arrival of Mittie Whitehurst on the scene, as the undisputed evidence shows, the conversation between defendant and Minnie Whitehurst was perfectly friendly. Immediately on the arrival of

the automobile in which Mittie, her brother Ectrick and Ethel Pinkerton came to the "Union Tavern" a wordy altercation between defendant and Minnie Whitehurst ensued, in which Minnie Whitehurst applied to defendant vile epithets and in which he applied to her the same character of vile epithets.

The defendant's theory of the circumstances leading to the killing, as illustrated by his testimony, is, to quote from brief filed in his behalf:

"On the afternoon of Monday, the day on which the killing took place, the deceased and Ectrick Whitehurst came to where he (the defendant) was at Royal and Government Streets. Ectrick Whitehurst came into the restaurant where he was and called him and asked him to come out and talk to his sister. The deceased asked him to return to her a pistol which had been her property and which the defendant had pawned, and he agreed to get it and to take it to her at her mother's place. He did get it and he and George McInnis, who is charged with him in the case, went to the Union Tavern. When they reached there the deceased was not present and he waited for some time, during which time he engaged in conversation with Minnie Whitehurst, the mother of the deceased. There is no conflict but that during this time he had in his possession the deceased's pistol, and that during this time the conversation was more or less without difficulty. After he had been there for some few minutes the deceased drove up in an automobile with her brother and the girl Ethel Pinkerton.

"* * * the defendant testified that at this moment Minnie Whitehurst cursed him, using vile epithets and struck at him with a rubber hose, the end of which was plugged with wood making an effective billy, and at the same time one of the sons, Louis Whitehurst, charged at him and struck him. He drew his gun and as he did so the deceased ran between him and Minnie Whitehurst, her mother, and was struck by the bullet. She then ran around the corner on Royal Street where she died. The defendant struck Minnie Whitehurst but did not kill her."

The defendant in the confession made at police headquarters immediately after the killing stated, among other things:

"When I went there I carried a pistol concealed about my person. It had six cartridges in the chamber of the gun and I also carried some extra cartridges. I do not know whether I had six extra cartridges or more. I really did not intend to harm my former wife but it was my intent to kill her mother after she started to cuss me. I shot at Mrs. Whitehurst three or four times and but do not know how many times I hit her. I was about six or seven feet from Mrs. Minnie Whitehurst when I was shooting at her. Mittie Peters was on the right hand side of her mother and when I started to shoot she got in front of her mother and that must to have been when I shot. I really intended to kill Minnie Whitehurst and shot at her heart. I do not know how many times I shot at them when they were together. I don't think that Mittie Peters or Mrs. Minnie Whitehurst had anything in their hands at the time I was shooting at them. Louis Whitehurst, after the shooting hit me on the head with a piece of iron so far as I can remember, or something heavy. After this shooting I walked down the street about 40 or 50 feet and I saw that my gun was unloaded so I reloaded it. I put five or six cartridges in it. I then went back inside of the place determined to kill all of the rest of them."

The fact that Margaret Waltman, who was not subpoenaed as a witness, had been in the court room and heard some of the witnesses testify, did not justify the court in refusing to allow defendant to examine her as a witness, since it was made to appear that neither the defendant nor his counsel knew that she was an eye witness to a part of the difficulty between defendant and the Whitehursts, and she was not in the court room by procurement of defendant or his counsel. Degg v. State, 150 Ala. 3, 43 So. 484; H. J. Mitchell v. State, 28 Ala.App. 119, 180 So. 119.

This ruling constitutes reversible error. The question at issue before the jury and within their peculiar province was not only the guilt or innocence of the defendant, but if guilty what the punishment should be. The testimony of said proffered witness related to the res gestae of the alleged crime, and we have no way of evaluating the testimony, or adjudging what weight it may have had on the jury.

Many of the rulings of the court complained of relate to evidence which the

defendant proposed to introduce to establish a predicate for allowing lay witnesses to testify that in the opinion of such witnesses the defendant was insane. Among other things that the house known as the "Union Tavern" operated by the deceased's brother, where the mother of the deceased lived, was operated as a house of prostitution, and that deceased's mother induced her to absent herself from defendant's home and their baby, and practice prostitution.

That the said Minnie Whitehurst, in connection with the Union Tavern, operated a house of prostitution.

That said Minnie Whitehurst sometime before going to the Union Tavern operated a house of prostitution on Conti Street in the City of Mobile. This evidence was not relevant to the issues in the case, nor was it competent as going to establish a predicate for the opinion testimony of lay witnesses that the defendant was insane.

■ To qualify such witness to express an opinion that the person, the subject of the inquiry, is insane, it must appear from the testimony of the witness that he has such acquaintance, continuous intimacy with the person as to observe his character and habits, which reasonably enables the witness to form an opinion, and the witness must state the acts, declarations and conduct of such person, tending to show that such person is afflicted with mental distemper. McCurry v. Hooper, 12 Ala. 823, 46 Am.Dec. 280; 14 R.C.L. 617, § 68; Parrish v. State, 139 Ala. 16, 36 So. 1012; Sorter v. Austen, 221 Ala. 481, 129 So. 51; Bachelor v. State, 216 Ala. 356, 113 So. 67; Howard v. State, 172 Ala. 402, 55 So. 255, 34 L.R.A.,N.S., 990; Queenan v. Oklahoma, 190 U.S. 548, 23 S.Ct. 762, 47 L.Ed. 1175; 23 C.J.S., Criminal Law, pp. 78-80, § 867; 14 R.C.L. 617, § 68.

■ Proof of acts, conduct, declarations and delinquencies of others, though related to the prisoner and going to show motive for the crime under investigation, or tending to stimulate a desire for revenge, can not be made a predicate for such non-expert opinion.

■ The acts, declarations and conduct of the accused, constituting a part and within the res gestae of the alleged crime, can not be made the predicate for the opinion of such lay witness. The probative force of such evidence falls within the exclusive province of the jury, to be weighed and considered in connection with all other evidence. Clark v. Fisher, 1 Paige, N.Y., 171, 19 Am.Dec. 402; 14 R.C.L. pp. 601, 602, § 28; Pace v. Louisville & Nashville Railroad Company, 166 Ala. 519, 52 So. 52; Crotwell et al. v. Cowan et al., 236 Ala. 578, 584, 184 So. 195.

These well settled principles justify the court's action in sustaining the solicitor's objections to the proffered testimony, and the objections to questions put to the State's witness, Minnie Whitehurst. [R. p. 61]

■ The witness, Ethel Pinkerton, testified that she was shot by the defendant "immediately after he had shot Mrs. Whitehurst and Mittie Whitehurst," and at the same time and place. The court therefore, did not err in overruling the defendant's objection to her testimony detailing the circumstances and particulars in respect to the assault on her.

■ The defendant's counsel asked the witness on cross-examination: "Isn't it a fact that you have been living there with the Whitehurst boy, the brother of Mittie Whitehurst, and the son of Minnie Whitehurst, prior to the time that this occurred, and up to the present time?" The court ruled that the question called for testimony too remote to show interest or bias, and sustained the solicitor's objection that it called for immaterial evidence and in this ruling committed reversible error. The feelings and relationship of a witness to interested parties are always relevant and material. Cook v. State, 152 Ala. 66, 44 So. 549; Underhill Cr.Ev. 222.

■ Viewing the whole evidence in connection with the statements of the defendant and circumstances tending to show that defendant entertained malice against the inmates of the Union Tavern, and went there with a design to kill all of said inmates, except Howard Whitehurst, it was not reversible error to allow the witness Louis Whitehurst to testify in detail in respect to the defendant shooting Ethel Pinkerton, though he testified it was five minutes after defendant shot Mrs. Whitehurst and killed Mittie Whitehurst. In the light of this evidence it was one continuous transaction. Dickey v. State, 15 Ala. App. 135, 72 So. 608.

■ The court did not err in sustaining the objection of the solicitor to questions put to the State's witness, Ectrick Whitehurst, on cross-examinations relating to

pleas of guilty and conviction of the Harmon Narcotic Act—a statutory offense not involving moral turpitude. Pippin v. State, 197 Ala. 613, 73 So. 340.

Nor was it error for the court to sustain the solicitor's objection to questions put to the witness, Lucille Carney, to show that she was a prostitute. Norris v. State, 229 Ala. 226, 156 So. 556.

The question to the witness, Bill Maxwell, by defendant's counsel: "From your opinion at that time, and from his appearance and his action at that time, are you of the opinion, or not, that he was at that moment insane?" was predicated on the res gestae of the alleged crime, which had been stated by the witness, and called for an answer which was within the province of the jury.

Subsequent questions to this witness were in the same category and the rulings in respect thereto were not erroneous.

The State's witness, James Quina, testified that he was one of the city detectives of Mobile; that he went to the scene of the killing a few minutes after being called over the telephone, and when he got there some of the Whitehurst boys and the defendant were on the ground in a struggle over the pistol and that Minnie Whitehurst, who had been shot in the mouth and through the hand, was beating the defendant with a piece of hose; that he had known the defendant ten or twelve years.

On cross-examination he testified: "I have seen Jimmie Peterson under various circumstances and conditions." He was then asked by defendant's counsel, as the bill of exceptions recites:

"At that time, at the time you made the arrest there, will you say he had the appearance of being normal or what was his condition?

"Mr. Chamberlain: I object to the question as calling for irrelevant, incompetent, and immaterial testimony, and calling for the conclusion of the witness. Objection sustained. Exception.

"Q. Did he appear to be excited, *or was he normal,* or was he quiet and reserved, or was he *nervous and excited?*

"Mr. Chamberlain: I make the same objections as to the last question.

"The Court: Whether, or not, he appeared excited, or not, I will let him answer that.

"Note: The question was read to the Court.

"The Court: I sustain the objection."

No exception was here reserved. [Italics supplied.]

The objection to the first question was properly sustained on the authority of Jones v. State, 181 Ala. 63, at page 78, 61 So. 434, at page 439, where it was observed: "The acts, declarations, and demeanor of an accused, before or after the offense, whether part of the res gestæ or not, are admissible against him, but unless a part of the res gestæ are not admissible for him. Maddox v. State, 159 Ala. 53, 48 So. 689."

There was no exception to the last ruling, and therefore it is not reviewable.

Dick Lincoln, examined for the State, testified that he went to the scene of the killing, after the killing, that defendant was then sitting in the police car, that Mittie was then dead on Royal Street about 60 feet from the corner, and there was blood on the sidewalk, and that Minnie Whitehurst, the mother, was all bloody.

On cross-examination, that he was a city detective, and further: "I know Jimmie Peters here. I have known him a pretty good while. About ten years, I reckon. * * * I know Jimmie Peters' little boy. I have seen him." The defendant's counsel here asked the witness: "Q. Did you ever had [have] any occasion or do you remember any occasion when Jimmie Peters has complained to you about Mittie leaving him and the child?" The court sustained the solicitor's general objection to this question, and the defendant excepted.

The question elicited testimony as to the acts, conduct and declarations of the defendant prior to the homicide, and was within the scope of the rule, stated above, relative to the predicate for testimony of a lay witness to express an opinion as to the insanity of the defendant, and the court erred in sustaining the solicitor's objection thereto.

The witness testified: "Before this trouble I used to see Jimmie Peters quite often throughout the past three years, and have had occasion to observe his manner and his demeanor as he went about his work, in his ordinary activities."

Thereupon counsel asked the witness, still on cross-examination: "Q. I

538

will ask you whether, or not, as time has passed there has been any change in his manner, *as to whether he has become more and more worried* or appeared to be excited and worried *about his baby* and *about his condition and about the fact that his wife had left him?"* [Italics supplied.]

This question calls for legal and material testimony and seeks to elicit evidence that is objectionable as a conclusion of the witness. In these circumstances the court will not be put in error for sustaining the objection. Boswell v. State, 63 Ala. 307, 35 Am.Rep. 20.

In Carney v. State, 79 Ala. 14, 17, the court, speaking through Stone, C. .J., observed: "Human emotions and human passions are not, in themselves, physical entities, susceptible of proof, as such. Like the atmosphere, the wind, and some acknowledged forces in nature, they are seen only in the effects they produce. * * * They are proved by what is called opinion evidence. Not the mere unreasoning opinion, or arbitrary conclusion of the witness, but his opinion, based on experience and observation of the conduct, conversation, and facial expression of others, in similar emotional conditions. Facial expression and vocal intonation are so legible, as that brutes comprehend them; and yet human language has no terms by which they can be dissected, and explained in detail. The reasoning in such cases is a posteriori, and the major proposition is but the sum or resultant of every one's experience and observation."

This logical statement was reaffirmed in Thornton v. State, 113 Ala. 43, 46, 21 So. 356, 59 Am.St.Rep. 97, in upholding a ruling that "he [witness] met defendant and another negro inside the corporate limits of Greenville, and that *defendant looked frightened when he saw him."*

Under this exception to the general rule, that a witness can state only facts, it was permissible for the witness to testify "that there had been a change in his (defendant's) manner," or that he "appeared to be excited and worried," but it was not permissible for the witness to state that defendant "had become more worried * * * about his baby and about his condition and about the fact that his wife had left him." The cause of the worry could only be proved by the utterances of the defendant giving vent to his worries and sorrow. Braham v. State, 143 Ala. 28, 42, 38 So. 919.

The questions put to the defendant's witnesses, Joe Palughi and George McGinnis, on direct examinations, were likewise objectionable and the rulings in respect thereto were free from error.

It is well settled that blood stained clothing worn by the deceased should never be offered or received in evidence in a murder trial, unless it has some tendency to shed light upon some material inquiry. Boyette v. State, 215 Ala. 472, 110 So. 812.

The evidence was in dispute as to whether the deceased was killed while passing in front of the defendant, who was then shooting at Minnie Whitehurst, or whether she ran from the scene and defendant followed and shot her down, and then stood over her while prostrate and shot her in the face. The State's evidence goes to show that she was shot three times, in the body, in the hand and in the head. The bill of exceptions, taken by the defendant, is silent as to whether the clothing and blood stained glove were perforated by bullet holes, and construing the recitals most strongly against the appellant, it will be assumed that the clothing offered and received in evidence was so perforated, and tended to shed light on the facts which were in dispute. Husch v. State, 211 Ala. 274, 100 So. 321; Rollings v. State, 160 Ala. 82, 49 So. 329. We are of opinion however that there was no sound excuse for allowing the solicitor to exhibit the bloody paper in which the clothes were wrapped for safe-keeping.

Bill Maxwell, the witness offered by the State, testified on cross-examination, without objection:

"I jumped out of the bathroom window getting away from the fuss, and anybody else would have, too. I came back in when the siren of the scout car sounded. I said a while ago I ran to the door and knocked George McGinnis out of the way. That was not after I jumped out of the window. The bath room is in the back yard. I went out of the back door there, and I pushed George out of the way, and I went in that bath room and jumped out of the window into the yard next door, into that old lumber yard, and got away, and did not come back until I heard the siren. I seen [saw] enough. I saw Jimmie when he came in the back door. He was running in is all that I can tell you. He ran in quick. He was excited and all wrought up. I could not tell you that he did not look like he usually looked. I did not stay in there that

long. He looked wild enough that I was getting out of his way. I have known him, I imagine, around 10 or 12 years. * * *

"I have seen him downtown practically every day when I was going to my mother's. I never heard him say much about Mittie being up there and staying away from him, because I did not butt into their business. * * *

"He just ran through the back door looking wild and everybody was excited, and I was getting out of the way, just the same as the rest were, trying to protect their life."

Johnnie Leonard, State's eye witness, who testified that he saw the defendant enter the house after he shot Mrs. Whitehurst and Mittie, testified on cross-examination:

"I was not thinking about shots, to be frank with you. I was in there and I heard 'bam, bam, bam' something like that, and it came to me that it sounded like pistol shots to myself, and as far as how many, I did not stop to count them, and I did not pay any particular attention; it happened all of a sudden. And I got up and walked to the door. I did not get quite to the door until a colored woman came running in hollering 'My God, hide me. Mr. Jimmie is up there shooting everybody,' and I took her in the back—back there where there was a shower bath, and I said, 'hide in there,' and when I got her in the shower bath and got back to the front Jimmie and George were standing in the door, and I walked on up there, and that is when I seen the pistol the first time. Jimmie was just inside of my door flush with the door. I heard several shots in succession and started to the door and then the negro woman came running in and said 'My God, hide me, Mr. Jimmie is shooting everybody up,' and I told her to get in the shower bath, and walked on to the door, and Jimmie was standing in my door. That was just a minute or just a very few minutes. I do not know how many shots I heard afterward. Then the woman came running in and then I walked to the door and Jimmie was there. I will say it is 100 to 125 feet from the corner back to my door. From the time I heard those shots fired and I started to the door and the girl came in I did not hear any more shots fired until after Jimmie had loaded that gun and went back, and after I went back I heard some more shots fired. The only thing I said was 'What is the matter, have you blowed your top?' "

Minnie Whitehurst testified, on cross-examination, inter alia: "I never had bad difficulties with him. [Referring to the defendant] I just tried to get him to do right. On this occasion, he came into my place and spoke pleasantly to me and then walked out on the sidewalk still talking pleasantly with me, and then all of a sudden he simply appeared to go wild."

 In the light of this evidence we are of opinion that the court erred in directing a verdict for the State by giving the following written charge, requested by the solicitor: "The court charges the jury on the issue formed in this case by the plea of Not Guilty by reason of insanity you must find for the State." The charge is bad in form, is without hypothesis, invades the province of the jury and has a tendency to mislead the jury to general verdict for the State. City of Birmingham v. Poole, 169 Ala. 177, 52 So. 937; Bessemer Liquor Co. v. Tillman, 139 Ala. 462, 36 So. 40; Louisville & Nashville Railroad Co. v. Sandlin, 125 Ala. 585, 28 So. 40; Southern Railway Co. v. Kendall & Co., 14 Ala.App. 242, 69 So. 328.

We have examined other questions and find nothing that requires further treatment.

For the errors noted the judgment is reversed and the cause is remanded. The defendant will remain in custody until discharged as required by law.

Reversed and remanded.

All the Justices concur.