291 So.2d 325

**Nick Jones STRONG**

**v.**

**STATE.**

**8 Div. 451.**

Court of Criminal Appeals of Alabama.

March 5, 1974.

Harvey B. Morris, Huntsville, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Roger M. Monroe, Sp. Asst. Atty. Gen., Birmingham, for the State, appellee.

HARRIS, Judge.

On the night of November 9, 1970, the owner of an off-premise licensed beer package beverage store, located at 405 Dallas Avenue in the City of Huntsville, Madison County, Alabama, was shot twice with a .22 caliber pistol during an attempted robbery. Two black men entered the store around 8:30 p. m. and ordered a six-pack of beer. Present at the time was the store owner and one employee. Both were sitting in chairs when the men came in. The employee got up and turned to a beer cooler and leaned over to get the beer. He heard one of the men say, "I want your money." When he straightened up, he saw both men with drawn pistols. The store owner said, "I don't have any money." One of the men pointed a pistol at the deceased and pulled the trigger but the gun would not fire. He turned to his companion and said, "Hand me that gun." His companion handed him the gun and he pulled the hammer back and fired the pistol point blank at the deceased who was still sitting in his chair. He then started backing out the door and fired the pistol at the deceased who had not moved from his sitting position with his legs crossed.

For a better understanding of who was involved in this case, we look to the indict-

ment which, omitting the formal parts, is as follows:

"The Grand Jury of said County charge, that before the finding of this indictment, Thomas Fuqua 'alias' Thomas Earl Fuqua; Charles Augusta Ward 'alias' Charles Augusta Ward, Jr., 'alias' Charles Agusta Ward, Jr.; William Carter; James Louis Toney and Nick Jones Strong, whose names respectively are unknown to the Grand Jury other than stated, unlawfully and with malice aforethought, killed Joe Bickley, by shooting him with a pistol, against the peace and dignity of the State of Alabama."

The employee testified that after the shooting, the deceased said to him, "He shot me, call the police and ambulance." The employee called the police who, in turn, called the ambulance. When the deceased was placed in the ambulance, he was still breathing, but died shortly thereafter.

The police soon arrived and conducted an investigation. They got a description of the two men from the employee, who said the men were about five-eight to five-ten feet tall, weighed around one hundred and fifty to one hundred and sixty pounds and both had an Afro hairstyle. The employee made a positive in-court identification of appellant as one of the men who came into the store the night of the shooting.

The employee also identified one of the participants in the crime from a number of photographs shown him by a police officer. Following this photographic identification, two police officers went to the home of Charles Augusta Ward at 206 Burn Avenue. They were informed by his mother that he was not at home. The officers left this address but parked a short distance away and watched the home. About thirty minutes later a car driven by James Louis Toney drove up and parked in front of the house. Ward was in the car on the passenger's side. The officers returned immediately and ordered both men out of the car and gave them a "pat down". A "blank" pistol was found on the person of James Louis Toney. This pistol was described as a model V 22 bearing the name Volcania. It was made in Italy and is commonly called a starters pistol or blank pistol. The officers searched the automobile with Toney's permission and found a .22 caliber pistol under the front seat on the passenger's side. The officer smelled the pistol and it had the odor of gun powder and in his opinion had been fired recently. These men were given the *Miranda* warnings at the scene where they were found and were carried to the station house for further interrogation. They were again given the *Miranda* warnings and they were questioned about the attempted robbery and murder at 405 Dallas Avenue.

As a result of the information gained from interrogating Toney and Ward, appellant was arrested on November 20, 1970, at the K-Mart on North Parkway in the City of Huntsville. At the time of his arrest he was told that he was charged with *murder* and was given the *Miranda* warnings. He was taken to Police Headquarters and again given the *Miranda* warnings. He signed a waiver of rights form called a "pre-interview form". He made an oral statement confessing the murder and implicating all the others named in the above quoted indictment. He was told that his statement was being taken in shorthand by a secretary of the Detective Division and that it would be transcribed by her. After the statement was transcribed it was presented to appellant who, after reading it himself, signed it in the presence of a detective and the secretary who took it in shorthand. The proper predicate was laid at trial and the confession was admitted in evidence. The confession is as follows:

"VOLUNTARY STATEMENT
   (Under Arrest)
"DATE  11–20–70  TIME  4:15 p. m.
PLACE  Huntsville  Police  Department

"I Nick Jones Strong, am 19 years of age and my address is 612 Pulaski Pike. I have been advised and duly warned by J. C. Brooks, who has identified himself as a Detective of the City of Huntsville, of my right to the advice of counsel before making any statement, and that I do not have to make any statement at all, nor incriminate myself in any manner.

"I Hereby expressly waive my right to the advice of counsel, and voluntarily make the following statement to the aforesaid person, knowing that any statement I make may be used against me on the trial or trials for the offense or offenses concerning which the following statement is herein made.

"I declare that the following statement·is made of my own free will without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or persons whomsoever.

"On 11–9–70 on a Monday night me, William Carter, and James Lewis Toney were at 109C Mason Ct. We were drinking wine. Thomas Fuqua came in. He said he needed some money. James Lewis and 'Baby Boy', Fuqua, went back by the back room in sort of a hallway. They started discussing something about money and they called me back there. The 'Duck', Charles Ward, came in. James Lewis asked Duck where he could find a gun. Duck said he would be back in about 30 minutes. He left and then came back. Fuqua kept saying he needed some money while Duck was gone. We all left and got in the car to go somewhere about hitting a place. Duck came up. We told him we were going riding around. He said he wanted to go. After Duck got in, we told him that we were going to try to get some money from somewhere. James Lewis asked Duck if he knew where he could get a gun. Duck said go down here and turn on Mitchell Drive. He said stop there in front of the feed place. The cab driver wasn't in. Toney pulled on down the street. Duck saw the cab driver pass and we blowed the horn trying to get him to stop. He didn't stop and Duck went down to the cab stand to get the gun. James Lewis went in the house in front of where the car was parked. I don't know who lived there or the number. James Lewis came back out and was waiting for Duck to get back. When Duck came back he had a gun. We left there and went over to Duck's house to get some money. We sat in the car while Duck was in his house. He was in the house about 10 minutes. He came out and we were in the car and someone mentioned a beer store on Dallas. We parked down from the armory. Duck said he couldn't go because the man knew him. James Lewis handed me the gun and William Carter got out with me. We walked by the store first and turned around and came back. We went into the store. I asked the man for a 6 pack of Falstaff. One man went to get the beer then I told them I had rather have the money. The man that was sitting in the chair said someones come by and picked it up.

"I had a pistol in my hand and I pulled the trigger and it wouldn't shoot then I told William 'Hand me that gun'. He handed me the gun then I pulled the hammer back and pointed it at the fellow sitting in the chair and it went off. The gun went off again as I was backing out of the door. We ran back to the car. William was ahead. William got to the car first. I said let's go. James Lewis asked what happend (sic) and I said I shot in there. Duck said let me have my gun and I gave it to him. We left, took off. We went back to William's house in Mason Court. We all went in the house. The radio was on and the bulletin said the man had got shot at a beer store on Dallas St. It said the ages of the colored men were about 19 or 20 two of them. Duck left and got a pint of

wine, which we drank. We played some records. Duck and James Lewis left. They didn't say where they were going. I spent the night with William. I think Thomas left. Around 12 or 1 o'clock we went to bed. This is all I remember about the case. END OF STATEMENT * * *

"I have read this statement consisting of 3 page(s), and I affirm to the truth and accuracy of the facts contained therein. "This statement was completed at 4:40 P.M., on the 20th day of November 1970.

"WITNESS: Joyce Winsett /s/

WITNESS: J. C. Brooks /s/

/s/ Nick Jones Strong
Signature of person giving
voluntary statement"

Mr. Van Pruitt, Assistant State Toxicologist, stationed in Huntsville, conducted an autopsy on the body of the deceased. His qualifications as a toxicologist and as an expert in ballistics were admitted by defense counsel.

He examined the body externally and noted the following injuries:

"Injury number one being a hole which measured one-quarter of an inch in its diameter and was located in the neck two inches above the level of the collarbone. There was a second hole which measured one-quarter of an inch in its diameter and was located in the upper left abdomen and three-quarter inches to the left of the midline of the body and two inches above the level of the naval.

"I then examined the body internally and observed that a hole which was observed in the midline of the neck ranged into the body from the front to the back passing through the trachea, which is the air passage to the lung, which would put it on a somewhat downward path to enter the second thoracic vertebra, which is the backbone, at which point the path terminated. The spinal cord was partially severed and a small projectile was recovered. The path of the wound in the left abdomen ranged in respect to the body somewhat downward from front to back, slightly from left to right. Its path was traced through the lower abdomen to partially sever the iliac artery and terminated in a large muscle deep in the floor of the back, where again a lead projectile was recovered."

It was his opinion that death resulted from the two gunshot wounds as above described and that "the spinal cord severing would have produced relatively prompt death or the partial severing of the iliac artery."

Mr. Pruitt test fired the .22 caliber pistol and made a microscopic comparison with the two slugs he recovered from the body of the deceased. He determined that the slug which he retrieved from the lower abdomen was fired from the barrel of this particular weapon. The slug he retrieved from the second thoracic vertebra was so distorted and damaged that he was unable to conclude that it was fired from this identical weapon though it was fired from a .22 caliber pistol.

Appellant did not testify but offered his father as a witness in his behalf. He testified that his son had lived with him nineteen years and that he supported him. He said the boy had "spells", and lots of times his eyes would get funny and he would foam at the mouth. It was his opinion that appellant was of unsound mind.

Upon appellant's first trial for this same offense, the jury convicted him of murder in the first degree and fixed his punishment at death and the Court sentenced him to death by electrocution. On August the 24th, 1971, this Court reversed the judgment of conviction because the record failed to affirmatively show an arraignment with counsel present. 47 Ala.App. 238, 252 So.2d 659.

The case was again called for trial on March 19, 1973, some nineteen months later. At the latter trial appellant was again

convicted of murder in the first degree and punishment was fixed at life imprisonment and the judgment of conviction and sentence thereon was in accordance with the jury verdict. In the interim between the two trials the Supreme Court of the United States on June 29, 1972, held the death penalty unconstitutional. Our Legislature has not seen fit to re-instate the death penalty. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

In United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427, decided December 11, 1973, the Supreme Court of the United States held that a search incident to a valid arrest was not limited to a frisk of the suspect's outer clothing and the removal of such weapons as the arresting officer may, as a result of such frisk, reasonably believe the suspect has in his possession but also held that a search may be made of the area within the control of the arrestee. In *Robinson*, supra, the arresting officers had probable cause to arrest the suspect for driving an automobile while his license was revoked.[1]

■ In this case the arresting officers found a pistol on one of the suspects. They were investigating an attempted robbery resulting in the crime of murder in which two pistols were observed. The automobile was in the immediate control of the arrestees and a search of his movable vehicle in which the death weapon was found was, in all things, valid.

The paramount issue pressed upon us for a reversal was the failure of the trial court to charge the jury on the law governing the offense of manslaughter in the first degree.

■ The law is well settled in this State that unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the homicide within some particular degree, it is much the safer rule to charge the jury on all degrees of homicide included in the indictment. Williams v.

State, 251 Ala. 397, 39 So.2d 37; Jarrell v. State, 251 Ala. 50, 36 So.2d 336.

■ Malice is an essential ingredient of murder. As a general rule, it is an inferential fact not susceptible of positive or direct proof. It arises by inference from other facts proven, and in the trial of cases of homicide is to be drawn by the jury, unless the evidence shows, *without room for adverse inference*, that the killing was intentional, and was accomplished by the use of a deadly weapon which, as a matter of law, may be pronounced a deadly weapon. Mitchell v. State, 60 Ala. 26; Wallace v. State, 41 Ala.App. 65, 124 So.2d 110; Hackman v. State, 41 Ala.App. 642, 148 So.2d 253; Kemp v. State, 278 Ala. 637, 179 So.2d 762; Brand v. State, 46 Ala. App. 41, 237 So.2d 524; Smith v. State, 47 Ala.App. 513, 257 So.2d 372.

In Jones v. State, 13 Ala.App. 10, 68 So. 690, the Court of Appeals, per Brown, J., said:

"Where the killing results from the intentional use of a deadly weapon—that is, a weapon which the court may pronounce such as a matter of law, such as a gun or pistol of sufficient caliber and carrying force as to produce death—and the evidence which proves the killing does not at least afford room for an inference rebutting the presumption of malice arising from the use of such weapon, it is then incumbent on the defendant to rebut that presumption by other evidence. If he fails in this burden, the presumption is conclusive against him, and no duty devolves upon the trial court to instruct the jury on any degree of homicide less than murder. Gafford v. State, 125 Ala. 1, 28 So. 406; Hornsby v. State, 94 Ala. 55, 66, 10 So. 522; Hadley v. State, 55 Ala. 31, 37; Mitchell v. State, supra; Gibson v. State, 89 Ala. 121, 8 So. 98, 18 Am.St. Rep. 96; Rogers v. State, 117 Ala. 9, 22 So. 666."

1. See also Gustafson v. Fla., 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456.

The trial court charged the jury on murder in the first degree, murder in the second degree, and manslaughter in the second degree, omitting to charge on manslaughter in the first degree. The only reason we can perceive for the court charging on manslaughter in the second degree was the statement that appellant made to the investigating officers that he was intoxicated. This was a bare and naked assertion by him without the slightest support from any other source whatsoever. Conceding, without deciding, the truthfulness of his self-serving declaration, there is not in this record one spark, tittle or glimmer of testimony going to show the required degree of intoxication that affords a defense in cases of this kind. Voluntary drunkenness does not excuse the commission of a crime and it is not a valid defense. It is a legal defense to crimes involving a specific intent. If one becomes so intoxicated as to be unable to entertain a specific intent then drunkenness to that degree is admissible in his behalf and becomes a jury question. There was not sufficient evidence in this case to justify the court charging the jury on *any degree of manslaughter*.

In an endeavor to be overly cautious, the court went beyond the call of duty in charging on manslaughter in the second degree. This charge was abstract under the evidence but it was favorable and beneficial to appellant and he has no cause to complain.

This was a macabre crime with no mitigating or extenuating circumstances, not in the lease. He shot a man who was in the full bloom of life, sitting in a chair with his legs crossed, looking at a ballgame. He did not move or rise from his chair. The only words uttered by the deceased was in response to a demand for money and he said, "I have no money." With these words he signed his own death warrant. It is a horrible indictment upon the very name of civilization of the ease with which human beings are turned into beasts. This is a crazy quilt society in which we live where men shoot down men for no other reason than to watch a man die.

Appellant's putative father was the only witness in his behalf. He testified that he was not married to appellant's mother with whom he had lived for about twenty-three years and that he had two other children by her. He said that he had raised appellant and supported him. He further testified that he had closely observed appellant for years and that in his opinion he was of unsound mind. He based his conclusion on the fact that he would sit for hours with his head in his hands and would foam at the mouth. This was all the testimony in support of the plea of not guilty by reason of insanity. This falls far short of the proof required to prove this special plea. Parsons v. State, 81 Ala. 577, 2 So. 854.

This case is controlled by another rule. A defendant is not entitled to instructions on the lesser-included offenses, where his confession of the act charged was admitted, and he relied on evidence of insanity. Riddle v. State (robbery), 41 Ala.App. 544, 139 So.2d 347; George v. State (murder), 240 Ala. 632, 200 So. 602.

In his closing argument to the jury, the district attorney made some reference to the jury finding the defendant guilty and fixing his punishment at life imprisonment and recommending to the court that he never be allowed parole. This type of argument is improper and the court sustained appellant's objection thereto. Appellant moved for a mistrial and the motion was overruled. Matters dealing with parole are left to the discretion of the Pardon and Parole Board and should never be the subject of comment in a criminal prosecution, but no error intervened in this instance.

This killing occurred in 1970 and today the case is still going through the courts. It has been said that sometimes justice treads with leaden feet and that is true

here. This case is overweighted with lead. It is past time to bring it to an end and close the prison gates on a human misfit who is unfit to mingle in our society.

The case is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.