296 So.2d 252

**Billy Ray ROGERS**

v.

**STATE.**

**4 Div. 273.**

Court of Criminal Appeals of Alabama.

June 4, 1974.

Homer W. Cornett, Phenix City, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and James L. Hunt, Sp. Asst. Atty. Gen., Tuscumbia, for the State.

HARRIS, Judge.

Appellant was convicted of murder in the second degree and sentenced to thirty-five years in the penitentiary. Prior to arraignment, the court ascertained that appellant wanted a lawyer but was not financially able to employ one and the court appointed counsel to represent and defend him. At arraignment he interposed a plea of not guilty. The court appointed another lawyer to represent appellant on appeal.

It is undisputed that appellant shot and killed the deceased on July 20, 1973, with one shotgun blast with a sixteen gauge single action gun using number eight shot. It is also undisputed that the deceased was unarmed with the exception of an unopened knife in his right pants pocket. It is further undisputed that both appellant and the deceased were drinking heavily on that date. Appellant admitted drinking wine, beer and whisky. A blood alcohol test showed the deceased had a level of 0.24 which is a high state of intoxication—staggering drunk.

There were a number of witnesses to this killing and they gave different versions as to the events leading up to the shooting. It is fairly inferable from the testimony that the witnesses were also drinking intoxicating beverages. The main witness against appellant was his former common law wife, "Big Gladys" Sheppard, who became the common law wife of the deceased about one year prior to the homicide. "Big Gladys" and appellant lived together as husband and wife for three years and a daughter was born of this union. "Big Gladys" had one ceremonial marriage and three common law "live ins".

On the day of the homicide, "Big Gladys" and the deceased drove to the home of appellant's sister and mother for a visit. Up-

on learning that appellant was in the house, "Big Gladys" told the deceased to "Let's go." Appellant's sister told them it was all right to stay, saying appellant was not drinking at the time and he would not start any trouble. They walked in the house and appellant asked them for a drink saying he really "needed a drink as he was about dead." "Big Gladys" said the deceased had a bottle of wine for appellant's mother and he could have a drink from the bottle. All of them started drinking wine and the bottle was soon empty. Appellant claimed he had never seen or met the deceased before that day, but after the wine was consumed he asked the deceased to drive him to a dairy so that he could collect some money due him and he would buy some beer. The deceased told him the car belonged to "Big Gladys" and she would have to drive. "Big Gladys" drove and appellant rode on the front seat with her. The deceased and appellant's mother rode on the back seat. The dairy trip did not pay off and appellant's mother told them to take her to a bank in Phenix City and she would cash a twenty-dollar check. After cashing the check, she gave the money to appellant and they went to a grill and drank beer. They became boisterous and were asked to leave. They went to a state store and appellant bought several bottles of wine and a fifth or two of whisky. He passed the sack of wine to the back seat and started drinking the whisky.

Enroute back home "'Big Gladys" started fussing at appellant for not sending her some money to help support his daughter. Appellant told her he wanted to send her some money while he was working in Florida but he did not know where she was living. He said, "I haven't seen her, you know, since the early part of 1972." The deceased spoke up and said, "Well, I don't see why you should give a damn, it's not your daughter anyway." This statement brought on an argument between appellant and the deceased as to the paternity of the child and appellant became angry. He asked the deceased "how in the hell would you know", and the deceased said, "Ellis (he was referring to Ellis Holloway one of "Big Gladys'" former common law husbands) cut you one time about this same thing, hasn't he?" And appellant replied, "Yes, he cut me once, but nobody knows but me." When they arrived at their destination, everyone got out of the car and sat on the porch except the deceased who stood around the car. Ten minutes later, the shooting occurred.

"Big Gladys" testified that appellant went in the house and returned with a shotgun and said, "I'm going to kill that ____ ____ ____ ____," and shot the deceased from the porch. She said no words were exchanged before the shot was fired and the deceased did not have anything in his hands and was not advancing on appellant. She further testified that when the deceased fell to the ground, she ran to him and got on her knees to aid him and appellant came and kicked him on the side of his head and said, "He's a dead ____ ____ ____ ____ and you're going to be if you don't leave." She said appellant then kicked her three times, one on the side of her head, one in the neck, and one on her hip. She got in her car and left.

Appellant tells a different story. He said he ordered the deceased to leave two or three times and finally told him, "____ ____ it, Bobby, get in the car and leave." He claims the deceased said, "I'm going to leave all right; I'm going to finish what Ellis (Ellis Holloway, above) started." He said the deceased ran his hand in his pocket and started towards him and he shot him. He denied kicking him after the shooting and denied kicking "Big Gladys".

At the conclusion of the state's case, appellant made a motion to exclude on the ground a prima facie case had not been shown in that the state failed to prove malice. The motion was overruled.

■ In a criminal case, a motion to exclude the state's evidence is a proper method of testing the sufficiency of the evidence. Dugue v. State, 36 Ala.App. 426, 57 So.2d 372.

This was an unprovoked killing without any extenuating or mitigating circumstances. The state's evidence pointed overwhelmingly to appellant's guilt of a cold-blooded murder. If the trial court had granted the motion to exclude, it would have been a travesty on justice.

Appellant urges a reversal of this case because the trial court refused to charge the jury on the law of manslaughter. Unless it is perfectly clear that there is no evidence tending to bring a homicide within some particular degree, it is much the safer rule to charge on all degrees of homicide included in the indictment. Williams v. State, 251 Ala. 397, 39 So.2d 37; Miller v. State, 40 Ala.App. 533, 119 So.2d 197.

It is also true that where the killing results from the intentional use of a deadly weapon, that is a weapon which the court may pronounce such as a matter of law, such as a gun or pistol, and the evidence which proves the killing does not at least afford room for an inference rebutting the presumption of malice arising from the use of such weapon, and there is no other evidence to rebut the presumption, then no duty devolves upon the trial court to instruct the jury on any degree of homicide less than murder. Gafford v. State, 125 Ala. 1, 28 So. 406; Rogers v. State, 117 Ala. 9, 22 So. 666; Hornsby v. State, 94 Ala. 55, 10 So. 522; Whitehead v. State, 206 Ala. 288, 90 So. 351; Kelly v. State, 235 Ala. 5, 176 So. 807.

At the conclusion of the court's oral charge, no exceptions were reserved. As a matter of fact appellant's counsel announced that the defendant was satisfied. Furthermore there were no requested charges on the law of manslaughter and no motion for a new trial.

We have carefully searched the record and have found no error injuriously affecting the substantial rights of appellant.

Affirmed.

All the Judges concur.