Appellant was convicted of murder in the first degree and sentenced to life imprisonment. He had pleaded not guilty and not guilty by reason of insanity, to an indictment charging him with killing Walter T. Austin, Jr., by stabbing him with a knife.
According to the undisputed evidence, in the early afternoon of May 30, 1974, Austin left his home in Decatur, Georgia, on a vacation trip to California. He had about one thousand and fifty dollars on him at the time. He was traveling alone and *Page 196 
driving his own automobile. He had a gold Longine watch at the time and was wearing a diamond ring with a yellow gold chain. He had placed in the trunk of his automobile a tape recorder, a portable radio and a color television set. Late the same afternoon he telephoned his father at Decatur and told him he was having car trouble. In the early evening he checked in at the Holiday Inn at Tuskegee, Alabama. He afterwards made his way to the Tiger Lounge of the Inn; there he met and talked with defendant. He was accompanied to the motel by three teen-age males, Carl Hunter, Kenneth Hunter and Joe Berry, the first two being his nephews and the third related in some way by blood or marriage to defendant. The three were almost grown, but they were not allowed to buy drinks and did not remain in the lounge. Defendant was some twenty years older than Austin, but they seemingly soon became good friends and drank rather heavily until midnight. Defendant was apparently well known and introduced Austin to his friends, including the mayor of Tuskegee about 10:00 P.M. About midnight defendant and Austin left the lounge and lobby, went to Austin's automobile and departed from the premises of Holiday Inn in the automobile then driven by Austin. About the same time, the nephews of defendant, and Joe Berry, left the premises in their automobile, in which they had recently come to Tuskegee. The two automobiles were going in the same direction when last seen by anyone at Holiday Inn.
About 4:45 on the morning of May 31, one George P. Brown, who lived in the area of the National Forest in Macon County, noticed a light or fire in the forest. He went in that direction, found a fire, proceeded to attempt to put it out, and while doing so observed the body of a man, who was afterwards determined to be Austin. Police arrived about 5:00; the body was taken away by ambulance. A post-mortem examination was made. There were burns and "cutting type wounds" on the body.
The undisputed evidence also showed that between 2:00 and 3:00 A.M. May 31, defendant with his nephews and Joe Berry went to the home of a brother-in-law of defendant in Tuskegee, and according to the brother-in-law, defendant said, "He had been somewhere and said he clipped somebody." Defendant asked for a shirt and his brother-in-law gave him one. The four stayed there about thirty minutes. About 4:00 A.M. the same morning, defendant and the three young men went to the home of defendant's half-sister in Opelika, where they stayed until about 6:30 or 7:00. During that time, one or more of them, to the knowledge of defendant, gave some of the family of defendant's half-sister, the ring and the watch owned by Austin. They left, on the back porch of defendant's half-sister, Austin's TV, radio and tape recorder.
A sister of defendant testified that about 8:00 P.M. May 31, defendant and the three young men heretofore mentioned came to her home; she told him "the police had been out to the house concerning a man that had got killed." He said he "wasn't worried about it" and that "a dead man can't talk." Soon thereafter defendant was arrested, and in due course separate indictments were returned against defendant, Carl Hunter, Kenneth Hunter and Joe Berry.
Evidence presented by defendant consisted chiefly of (1) testimony that the day before the night of the death of Austin, defendant had left his knife with another person while working with him laying linoleum in a woman's house, (2) testimony of persons who had known defendant for thirty years as to eccentricities bearing on his mental condition and (3) testimony of defendant himself. Defendant also called Carl Hunter, Kenneth Hunter and Joe Berry as witnesses, but each of them took the Fifth Amendment.
Defendant testified that he did not kill Austin. He said that after he and Austin *Page 197 
left Holiday Inn, "I fair went off to sleep. The next thing I remember was them waking me up. I think it was one of the boys and Tom (Austin) that woke me up." Defendant got in the other car, which Berry was driving. Austin took something out of his car and put it in the other car. He heard some of them say that "they saw a flame." Defendant said he went to sleep and said "when y'all get where you're going, please wake me up." When he woke up he saw a fire, and he asked two of the boys where Austin was, and they said, "He's out there cutting the fool." Defendant got out of the car he was then in, went out toward the fire and asked Austin to come on. Defendant got back in the car Berry had been driving. It was driven off and defendant fell asleep. He remembered going to the house of his brother-in-law, the house of his half-sister, and substantially corroborated the testimony as to what happened there as it is narrated above.
Appellant says that he was entitled to favorable action of the court on his motion to exclude the evidence and his written request for the affirmative charge in his favor. He argues that the evidence failed to show that anyone killed Austin by stabbing him with a knife as charged in the indictment. The toxicologist, who testified for the State, never said that Austin was killed by being stabbed by a knife. However, he did say that in his opinion death was "due to the loss of blood or exsanguination and shock due to the multiple cutting type wounds to the body, and specifically attributable to laceration of the left external jugular vein." He also said: "In my opinion the wounds were consistent — some of the wounds were consistent with the two types of instruments. There were wounds to the back of the head that suggested blunt force type injury. These areas were referred to as lacerations. There were other wounds that suggested a tool or an implement having a cutting edge."
Conceivably there could be circumstances in which a person could have been killed without the use of a knife as a result of wounds such as were described by the toxicologist, but under all the circumstances shown by the evidence in this case, it is difficult to conceive of the wounds referred to as "cutting type wounds" and wounds made by a tool or an instrument "having a cutting edge" as not having been made by an instrument which could be properly referred to as a knife. A knife is generally defined as "a cutting instrument consisting of a sharp blade with a handle." Of course, the pathologist could hardly have known whether the instrument had a handle, other than by deduction, but even if it were necessary to show that the instrument had a handle in order to show that it was a knife, we think the jury was warranted in finding that the instrument could not have been effectively used as it was without its having a handle or without someone improvising a handle for it at the time of its lethal use. In Hull v. State, 79 Ala. 32,33, it was said:
 "Though the indictment charges a particular weapon, the averment is substantially proved, if it be shown that some other instrument was employed, which occasions a wound of the same kind as the instrument charged, and the same consequences naturally follow."
We have followed and applied the principle, in Trammell v.State, 53 Ala. App. 246, 298 So.2d 666 and Matthews v. State,51 Ala. App. 417, 286 So.2d 91. In each of the cited cases a more specific kind of a cutting instrument than a knife was alleged in the indictment. The generality of the averment as to the instrument used furnishes a greater opportunity for proof to support the allegation. There was no variance between the allegation and the proof, and defendant was not entitled to a motion to exclude the evidence or to a general charge in his favor, by reason of any claimed variance. No other reason is asserted, and we are confident that a jury issue was presented as to all the material averments of the indictment. *Page 198 
The court orally charged the jury as to the elements of both degrees of murder. It did not charge the jury as to manslaughter in either degree. It provided the jury with three forms of verdict: (1) guilty of murder in the first degree, (2) guilty of murder in the second degree, and (3) not guilty. In giving the oral charge to the jury, the court stated, "I have the forms of verdict approved by the Defendant and the State." At the conclusion of the oral charge, the following occurred:
"THE COURT: What says the State?
"MR. AARON: Satisfied.
"MR. PRICE: Satisfied, your Honor.
 "THE COURT: What says the Defendant? (Whereupon a conference was held at the bench).
 "MR. RAYMON: I believe the Court's charge at the present time, so far it's all right, but I think that when you charged the jury to the effect of drinking, I think you should go further and charge on manslaughter in the first degree.
"THE COURT: You may be right.
 "MR. RAYMON: We're asking that the Court charge on manslaughter, and the Court is refusing?
"THE COURT: Yes, sir.
 "MR. RAYMON: We except to the Court's refusal. I think it might be well to put that in writing.
"THE COURT: You can make it in the form of a motion.
 "MR. RAYMON: In addition to that, if it please the Court, the indictment, as I understand the law, contains not only manslaughter in the first degree, which I think would be appropriate, but the Court refuses to give that, and under the circumstances, since the Court has charged on drunkenness, I think it would be appropriate to give manslaughter in the second degree, and we ask for that, and I understand the Court refuses to give that, and we except to that. I will further point out to the Court that what it amounts to is that the Court is giving to the State what amounts to the affimative charge insofar as manslaughter in the first degree and manslaughter in the second degree, and not giving the defendant —
 "THE COURT: I don't believe there's enough evidence in here to charge on manslaughter in the first degree.
 "MR. RAYMON: But when you have before the Court as evidence as to drunkenness —
 "THE COURT: I think you may be right. I understand you are making a motion that the Court charge on first degree and second degree manslaughter, and I am overruling your motion.
 "MR. RAYMON: We except. And we are further excepting to the fact that the Court has stated that the indictment includes just the two degrees of homicide, murder in the first degree and murder in the second degree. We except to that as a matter of fact because the indictment does include the two other offenses.
 "THE COURT: Ladies and gentlemen of the jury. I will give these charges that were requested by the defendant here, which have already been covered, I think, by my oral charge, but I think I ought to give them."
Appellant insists that error prejudicial to defendant resulted from the failure of the court to charge the jury as to the lesser included offenses of manslaughter in the first degree and manslaughter in the second degree. The parties are at variance on appeal on the question whether there was sufficient evidence to justify a submission to the jury of the issues relative to manslaughter. They agree that a defendant can be so extraordinarily intoxicated that he is not guilty of murder *Page 199 
but can be guilty of manslaughter. They disagree on the question whether there was evidence of defendant's intoxication to that extent.
In a trial under an indictment charging murder in the first degree, the court should charge on all degrees of homicide included in the indictment, unless it is clear that there is no evidence tending to bring the homicide within some particular degree. Jarrell v. State, 251 Ala. 50, 36 So.2d 336; Williamsv. State, 251 Ala. 397, 39 So.2d 37; Strong v. State,52 Ala. App. 237, 291 So.2d 325; Rogers v. State, 52 Ala. App. 628,296 So.2d 252. There was some evidence in the case that at one time or another defendant was enjoying, suffering from, or insensible to, every conceivable state of intoxication. There was some evidence that during the time he was with Austin he went the full gamut of intoxication, — from jocoseness to comatoseness. The evidence was sufficient to justify instructions to the jury on the subject of manslaughter, and it would have been better for the court to have so instructed the jury. Whether there was error in the court's failure to so instruct the jury, presents an additional problem.
In Davis v. State, 246 Ala. 101, 19 So.2d 358, the court noted a difference between the absolute necessity for charging as to both degrees of murder, as mandated in effect by Code of 1940, Title 14, § 317, and the correctness of charging as to manslaughter when the evidence justifies it. The court said:
 "On the trial for murder in the first degree, the court defined murder in the first and second degree and manslaughter in the first degree, but omitted to define manslaughter in the second degree or to require a consideration of that form of crime. He was merely silent on the subject. The defendant excepted to the oral charge in that it failed to charge the jury on manslaughter in the second degree. We understand that the Court of Appeals assigned that exception as one ground for the reversal. It will be noted that this was a mere omission, and not an erroneous statement of the law nor a charge on the effect of the evidence without a written request to do so. Such an omission `cannot be made the basis for a reviewable question. Williams v. State, 147 Ala. 10, 25, 41 So. 992; Jones v. State, 174 Ala. 85, 93, 57 So. 36. The party's remedy is such cases of mere failure or omission is to request special written instructions according to the practice established by the statutes.' McPherson v. State, 198 Ala. 5, 7, 73 So. 387. See, also, Warren v. State, 197 Ala. 313, 72 So. 624.
 "The requirements of section 317, Title 14, Code of 1940, do not affect this rule of practice. . . . However when the evidence justifies a finding of manslaughter in either degree a definition of them both should be given the jury to enable them to reach a proper verdict. But there is no statutory requirement to that effect as is so in respect to the degrees of murder. But in neither instance is the mere omission a basis for review on appeal."
We followed the precept of Davis in Tranholm v. State,38 Ala. App. 57, 77 So.2d 491, cert. denied 262 Ala. 703,77 So.2d 494.
The question becomes different, however, in view of the fact that apparently the court indicated that defendant need not make his request in the form of a written request on the subject but that he could do so by motion, which he did by oral motion. The difficulty is enlarged by reason of the quoted portion of the court's oral charge to the effect that the parties had approved the forms of verdict, which did not include any form of verdict as to manslaughter.
We are not persuaded by argument of appellee that the verdict finding defendant guilty of murder in the first degree, as distinguished from murder in the second degree, rendered innocuous any error committed in failing to charge the *Page 200 
jury as to manslaughter. Absence of malice distinguishes manslaughter in the first degree from murder in either degree.
In view of our action as hereinafter shown as to other alleged prejudicial error, and the unlikelihood of the necessity for a determination of whether it was reversible error for the court to fail to instruct the jury as to manslaughter, as orally moved by defendant, we forego such a determination on this submission.
Of the several witnesses testifying for defendant, at least four were questioned as to irrational behavior by him over a course of several years before the alleged crime. A friend of twelve years said that defendant "talked to himself a lot" and would do so "out loud," that "he would sing out loud all the time," he would "walk around singing." He said that defendant's conduct as to singing out loud had "been a consistent thing over the past ten years." Another long-time acquaintance said that defendant for a period of ten years would come by his house "all times of night with his little dog, which I never did see the dog," that defendant "walks all night some nights." Defendant's sister said that defendant was "a completely changed person" after his discharge from the armed services; thereafter he would call the people in the morning at 3:00, would come "to your house at all times of night, hollering and drunk and loud and carrying on." She referred to his being "committed to the hospital by the Probate Court" prior to the alleged crime. A nurse's assistant at the VA Hospital testified as to the difference between the behavior of defendant before entering military service and his behavior thereafter, such a difference that she "did not particularly care to associate with him after he had gotten out of the service." He would want to sing or cry. She said, "There were numerous things there at the VA Hospital, he said he was a doctor and he wouldn't mop the floor," that he "always talks to the dog," but "I never saw a dog.", and that "my kids got the impression that there was another dog there." Each witness from whose testimony we have just quoted was asked whether in the opinion of the witness defendant "was of sound or unsound mind." The prosecution objected to the question in each instance, and each objection was sustained. Defendant reserved an exception and in at least one instance made it clear to the court that if the witness were allowed to answer the question, the answer would be that defendant "is a man of unsound mind, in her judgment."
A psychiatrist testified to the effect that defendant was sane. Defendant offered no evidence of medical experts on the subject. He sought to prove insanity by lay witnesses, who testified to long and close acquaintance with him and to many instances of abnormal behavior. The court's refusal to allow defendant to show by the lay witnesses that in their opinion defendant was a man of unsound mind constituted error to reverse.
The acquaintance of the witnesses meets the test of "intimate acquaintance," "sufficient association" and "continuous intimacy" set forth in Peters v. State, 240 Ala. 531, 536,200 So. 404, 407 as follows:
 "To qualify such witness [a lay witness] to express an opinion that the person, the subject of the inquiry, is insane, it must appear from the testimony of the witness that he has such acquaintance, continuous intimacy with the person as to observe his character and habits, which reasonably enables the witness to form an opinion, and the witness must state the acts, declarations and conduct of such person, tending to show that such person is afflicted with mental distemper."
Judge McElroy states the rule:
 "A lay witness may testify that it is his opinion that another was insane or afflicted with an analogous mental defectiveness if, but only if, the witness has first testified (a) to facts showing that he had an adequate opportunity to *Page 201 
observe such other's conduct in general, and also (b) to his personal observation of specific irrational conduct of such other. Norris v. State, 16 Ala. 776; Ford v. State, 71 Ala. 385; Parrish v. State, 139 Ala. 16, 36 So. 1012; Equitable Life Assur. Soc. etc. v. Welch, 239 Ala. 453, 195 So. 554." McElroy, Law of Evidence in Alabama, § 128.02.
Appellee contends that the refusal of the court to allow the evidence sought to be shown by defendant was within the discretion of the trial court, and cites cases holding that the trial court has broad discretion to determine whether the witness has sufficient acquaintance with the person whose sanity is in question and whether he has observed sufficient irrational behavior on the part of such person to qualify the witness to speak on the subject. Nevertheless, such discretion is not broad enough to deny a defendant the right to present evidence by law witnesses that he was insane, irrespective of the extent of their acquaintance with him and of the number of specific incidents of his irrational behavior they have observed. Furthermore, the record shows that the trial court was not basing its ruling on the lack of the required qualification of the witness by sufficient acquaintance and observance of enough irrational behavior to testify as to defendant's unsoundness of mind but on the theory that a lay witness could not, under any circumstances, testify as to the mental state of another individual, as demonstrated by the following portion of the interrogation of one of the witnesses:
 "Q Now, from your observation of his conduct and nature of his actions, do you have a judgment as to whether or not he is a person of sound or unsound mind?
"A Well, Solomon —
 "MR. YOUNG: I object to that question, Your Honor, because it calls for a conclusion and opinion of a lay witness. She can testify as to what she observed, but not to the mental state of another individual.
"THE COURT: Sustain the objection.
You have your exception. That's for the jury."
And on another occasion:
 "MR. YOUNG: I object to that, that's calling for an opinion of the witness, who is not an expert, and a conclusion of the witness.
 "THE COURT: It invades the province of the jury. Sustain the objection."
Nor are we persuaded by argument of appellee to the effect that no harm was done by not allowing lay witnesses to give their opinion as to defendant's unsoundness of mind, as some of the witnesses had described defendant's behavior in a way that "was of the same substance as, and probably of greater effect than, would have been testimony that the defendant was `of unsound mind.'" Reference is made to a statement of one of the witnesses that she felt "like he just really disarranged since he came out of the service." This witness, however, was not one of the witnesses who was asked her opinion as to the soundness of mind of defendant. Another witness who was interrogated, but not allowed to answer, as to the soundness or unsoundness of mind of defendant, detailed instances of his unusual behavior and said further, "Just all kind of things like that let you know that he was not right," and another of such witnesses stated: "I'm not being funny, but I thought he was crazy." The quoted statements relied upon by appellee as indicating views of the particular witnesses as to the question of sanity of defendant were not sufficient, in our opinion, to warrant a denial to defendant of their unequivocal opinions as to the soundness of defendant's mind. Even if they were, they could not have assuaged, in the least, probable injury to defendant in not allowing him to show the opinions of other witnesses that he was of unsound mind. *Page 202 
The testimony of a lay witness that another is insane must be prefaced by a showing of apparently irrational behavior on the part of the other over a sufficient period of time for the witness to be able to form an opinion that the other is insane, but the witness' testimony that the other has on many occasions conducted himself abnormally does not in and of itself always indicate either that the other is insane or that it is the opinion of the witness that he is insane. As a matter of common knowledge, there are those who, at times intentionally or unintentionally, seriously or in fun, conduct themselves in a manner that persons not knowing them might deem them insane but people who do know them, strongly believe them to be sane. A jury may be misled by the testimony of such lay witnesses, but if they are telling the truth, their testimony is of great value to the trier of the factual issue of sanity vel non and each side of the judicial controversy is entitled to it. As better stated by Justice Faulkner in Williams v. State,291 Ala. 213, 279 So.2d 478:
 "As with every rule of law, there is a reason for permitting lay opinion, properly predicated, on the issue of sanity: introduction of a breath of fresh air into the often rarified atmosphere of conflicting expert psychiatric testimony. To supplement the testimony given by an expert, the opinion of someone who has known the subject over a period of time: `he seemed sane' or `he seemed insane' is most valuable to a jury for their deliberation on the issue of insanity, since this was a question for the jury."
There was no testimony of a psychiatrist to support the plea of not guilty by reason of insanity in this case, but a jury issue as to insanity was presented, as recognized by the parties and the oral charge of the court. The opinions of the lay witnesses that defendant was of unsound mind would have had a natural tendency to have greatly benefited defendant on the issue, and the errors of the trial court in disallowing such testimony probably injuriously affected defendant's substantial rights.
On rebuttal, the State presented testimony of a special agent with the FBI as to incriminating statements made by defendant after his arrest. Appellant invokes the rule that a witness cannot be impeached by self-contradictory statements unless and until the proper predicate has been laid by a denial, or the equivalent of a denial, by the witness sought to be impeached that he has made the contradictory statement, after his attention has been called to the statement and the surrounding circumstances, including the time, place and persons involved. It is not necessary for us to determine whether the rule was violated, for the evidence was admissible, even in rebuttal, as statements in the nature of a confession, although they more properly should have been offered as part of the case in chief. Code of Alabama 1940, Recompiled 1958, Title 7, § 252;Blackwell v. State, 264 Ala. 553, 88 So.2d 347; Nichols v.State, 276 Ala. 209, 160 So.2d 619; Alexander v. State,51 Ala. App. 267, 284 So.2d 292. As noted by Mr. Justice Almon inAlexander, we note here:
 ". . . The statement [statements] offered in this case was voluntarily made after an explanation of constitutional rights in compliance with Miranda [Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694], supra."
It is to be further noted, however, in the instant case, that apparently the court may have admitted the testimony in rebuttal as impeaching testimony only. By reason thereof, a serious question is presented whether the trial court was in error in overruling objections of defendant. As the case should be reversed for the errors previously indicated and, as a clearer record can be presented on the subject if the point arises again on another trial, we make no determination of the immediate question at this time. *Page 203 
For the errors indicated, the judgment of the trial court should be reversed and the case remanded for a new trial.
The foregoing opinion was prepared by Supernumerary Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment below is hereby
REVERSED AND REMANDED.
All the Judges concur.