58 So.2d 599

**PEOPLES v. STATE.**

6 Div. 267.

Supreme Court of Alabama.

April 17, 1952.

Rehearing Denied May 15, 1952.

---

Matt H. Murphy, Jr., Birmingham, for appellant.

Si Garrett, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., and Robt. P. Bradley, Montgomery, of counsel, for the State.

STAKELY, Justice.

Samuel E. Peoples was indicted for the offense of unlawfully and with malice aforethought killing Clyde Gilmer Woods by striking him with a hammer. The defendant pleaded not guilty and not guilty by reason of insanity. As a result of the trial of the cause the defendant received the death penalty. The appeal comes here under the automatic appeals act.

Since the case must be tried again, as will hereafter appear, we shall not set forth tendencies of evidence in detail, but only so much of the tendencies of the evidence as appears to be necessary for an understanding of the present decision.

At about dark on the evening of February 11, 1951, the appellant went to the home of Mrs. Lorene McCombs near Lovick in Jefferson County, Alabama, and borrowed a hammer with the statement that he wanted it to fix a flat. The hammer was loaned to him and he asked for a paper bag in which to put the hammer. A wrapper off of a loaf of bread was found and he placed the hammer in the wrapper. He then left in a cab which was waiting outside with another person in it and since he heard that the children of Mrs. McCombs wanted to go to church that night, he promised to come back and take them to church. It was a Sunday evening.

The appellant returned to the home of Mrs. McCombs by himself in a cab and two of the boys in the family got in the back seat

of the cab and Doris McCombs, one of the girls in the family, who had known the appellant for about two and a half years, occupied the front seat. They were driven to the church and the boys got out and went into church. Appellant told Doris McCombs that he was taking her to Michael Woods to straighten out something. Michael Woods appears to have been a friend of her older sister. When they got back near her home, however, Doris McCombs got out of the car and entered her home. Her mother discovered that she had blood all over the back of her skirt and on the back of her legs and socks. Since she was not hurt in any way, her mother immediately called the officers. Some hours later in the evening the body of the deceased was found just off of a dead-end road about a half mile from the Woodland Club, where he had been seen earlier in the evening with the deceased. The head of the deceased had been mashed in by what, according to the Coroner, appeared to have been a blunt instrument. Near the body was found the hammer which was identified as the hammer which he had secured from the home of Mrs. McCombs. Later in the evening the cab was found abandoned about 7 to 10 miles from the place where the body was found. The inside of the cab was spattered with blood. The defendant was taken into custody by the officers at about 3 o'clock in the afternoon of February 12, 1951, and according to tendencies of the evidence, confessed to the killing. At the time he was taken into custody he had in his possession the billfold of the deceased with a driver's license therein for Clyde Woods.

I. Mrs. Zula Peoples was called by the court as a court witness on a request of the state on the statement that she was the wife of a brother of the defendant. She was asked if she remembered a conversation between herself and appellant on the afternoon of February 12, 1951, when the appellant came by her home. While she recalled that there was a conversation, she testified that she did not remember such conversation exactly, except, "Well, I just spoke to him, 'Good Evening'." She recalled that later on some men came out to see her but she couldn't say who they were and further testified that they took down in shorthand a statement made by her. She stated that she did not recall whether her recollection as to her statement could be refreshed or not by reference to the written transcript claimed to have been made of her statement. She was then handed a paper containing a transcript of what she is claimed to have said in the conversation. A number of questions were asked her as to what she said in the conversation after she was asked to refresh her memory by reference to a written transcript of the alleged conversation. To most of these questions she stated that she didn't remember or did not know. For example, she was asked the following question to which she made the following reply.

"Q. Now, did I ask you this question: 'Whether he made the statement to you that he had killed the taxi driver last night and that he had another taxi driver with him and that when he got through using him for such purposes as he wanted, he was going to kill him?' Did you answer that? A. I don't know."

The witness Mrs. Zula Peoples was also asked the following question to which she answered "No".

"Q. Then I will ask you if I didn't ask you this question: 'Q. In connection with his statement as to what he had done, did he tell you who it was or the circumstances?' and if you didn't make the answer: 'He said he didn't know. I said, "Son, you will kill your mother." He said, "Where is she?" I said, "She has gone to see Mrs. Wood." He said, "Mrs. Wood?" I said, "Yes." he said, "Well, who is that?" I said, "That is the man's wife, the cab driver that is missing; that is his wife she has gone up there to see." He said, "That is who the — — —" and called him that again. So when he read the paper he repeated it again and he said, "That is who that S B was," and he threw the paper down, a lady's paper next door. I had to go next door to borrow the paper, and he walked.

·over there with me and stood there and read it, and that was all there was in it, and threw the paper down. He said, "That is who the S B was".' Didn't he make that statement to you?"

After the witness had been interrogated in the manner described, J. W. Dickinson, a Court Reporter, was then put on the stand and he was allowed to testify that he had made a transcript of the conversation with Mrs. Zula Peoples and a number of officers and that she made answer to the officers in his presence, but not in the presence of the defendant. We illustrate this testimony by the following questions put to him and his answers thereto.

"Q. Was this question asked: 'Did he make the statement to you that he had killed the taxi driver last night and that he had another taxi driver with him, and that when he got through using him for such purpose as he wanted to, he was going to kill him?' Was that question asked? A. Yes, sir.

"Q. And did she answer, 'Yes, sir, he sure did'? A. She did."

We also illustrate the testimony of the court reporter by the following question propounded to him and his answer thereto.

"Q. Then did I ask her this question: 'In connection with his statement as to what he had done, did he tell you who it was or the circumstances?' and did she reply: 'He said he didn't know. I said, "Son, you will kill your mother." He said, "Where is she?" I said, "She has gone to see Mrs. Wood." He said, "Mrs. Wood?" I said, "Yes." He said, "Well, who is that?" I said, "That is the man's wife, the cab driver that is missing; that is his wife she has gone up there to see." He said, "That is who the — — —" and called him that again. So when he read the paper he repeated it again and he said, "That is who that S B was," and he threw the paper down, a lady's paper next door. I had to go next door to borrow the paper, and he walked over there with me and stood there and read it and that was all there was in it, and threw the paper down. He

said, "That is who the S B was." ' Was that answer made to that question at that time? A. Yes, sir, it was."

In Anderson v. State, 35 Ala.App. 111, 44 So.2d 266, 272, the court said:

"It is within the sound discretion of a trial judge, in the interest of truth and justice, to call to the stand and examine, or permit to be examined by both parties, any witness who may be able to shed light upon the issues, the court being careful to preserve an attitude of impartiality. * * *"

See also Hunt v. State, 248 Ala. 217, 27 So.2d 186; 16 C.J. 846. The fact that Mrs. Zula Peoples was called as a court witness did not preclude the state from seeking to impeach her testimony. 70 C.J. p. 795; Tillman v. State, Fla., 44 So.2d 644; Brown v. State, 91 Fla. 682, 108 So. 842; Wharton's Criminal Evidence, Vol. III, § 1390, p. 2276; Wigmore, Vol. III, § 918, p. 442.

The basis of allowing a party to attack the credibility of a witness not called by him is that the witness has testified to some material fact or circumstance relevant to the issue in the case. One method of impeaching a witness is, after a proper predicate has been laid, to prove that at another time and place he made a statement contradictory to that given in evidence. Dickson v. Dinsmore, 219 Ala. 353, 122 So. 437; Harmon v. State, 166 Ala. 28, 52 So. 348; 70 C.J. p. 1011; 70 C.J. p. 1019.

In the case at bar the state was allowed to show by J. W. Dickinson, a court reporter, that Mrs. Zula Peoples had told him and a number of officers who were with him at the time that the defendant told her that he had killed the deceased and done other things of an incriminatory nature. There had been no evidence by another witness as to whether defendant had told her the matters included in the questions to her. Whether defendant had done so had not become a disputed issue in the testimony. Mrs. Zula Peoples testified to no substantive fact in the case. She was not present when the offense was committed, knew nothing about the case and

testified nothing of a material nature with respect thereto. There was, accordingly, no basis for her credibility to be impeached. 70 C.J. p. 1045. Mrs. Zula Peoples could not be contradicted by asking her whether she had made statements to the court reporter and the officers and on her denial, prove that she did so. 70 C.J. p. 1045. To allow such proof would be only to destroy testimony which in itself was worthless. State v. Simmons, 52 Wash. 132, 100 P. 269. Furthermore it would allow under the guise of impeaching testimony, proof of a substantive fact by hearsay. The defendant was not present when his sister-in-law Mrs. Zula Peoples was interviewed by the officers in the presence of the court reporter. The testimony of the court reporter is merely hearsay. Thomas Furnace Co. v. Carroll, 204 Ala. 263, 85 So. 455; 58 Am.Jur. § 804, p. 449.

It clearly appears that the court was in error in allowing in evidence the testimony of J. W. Dickinson, the court reporter.

II. One of the issues in the case was the alleged insanity of the defendant. Mrs. Marguerite Peoples, the mother of the defendant, testified that in about 1945 her husband and the father of the defendant, committed suicide and that while the defendant had been up until that time a normal child, gradual deterioration in the son set in after the death of his father with the result that at the time of the indictment, in her opinion, he was insane. In rebuttal of this testimony the state sought to show that an attorney had been consulted when her son had had charges of forgery made against him. It is the rule that both the state and the defendant can show the defendant's acts, declarations and conduct prior and subsequent to the alleged crime which throw light on the inquiry as to his mental capacity at the time in issue. Coffey v. State, 244 Ala. 514, 14 So.2d 122.

It is the theory of the state that the action of the defendant in seeking the aid of counsel when he was charged with forgery tends to show normal intelligence, in seeking to protect himself under such circumstances. The decision of this court in Brothers v. State, 236 Ala. 448, 183 So. 433, is cited to support the contention of the state. In the case here referred to the defendant was indicted for assault upon his wife with intent to murder and the state was allowed to show that the defendant fled to another state, where under an assumed name he took his family with him, to remove them as witnesses and did other things to protect himself, the idea being that those things tended to show the action of a normal man under the circumstances. We do not consider the authority applicable in the case at bar.

Mrs. Marguerite Peoples was asked the following questions. "Q. Well, you have gone, in company with this defendant, to Mr. Morel Montgomery's office, when he was charged with forgery. You have done that?" and was also asked, "He has had numerous charges of forgery against him, has he not?" and also asked, "Q. There are cases pending against him, as of * * prior to the date of the 11th of February, for issuing worthless checks, in this court? Isn't that true, in Jefferson County?" We do not consider that the record in this case as to the matters under discussion, shows action on the part of the defendant tending to prove a normal mind. When Mrs. Marguerite Peoples testified that she and her son together went to the office of Mr. Morel Montgomery, it was not clear that it was the plan of the defendant to seek the aid of counsel or whether this was the plan of the mother. Certainly the fact that there were numerous charges of forgery against the defendant and that he had cases pending against him for issuing worthless checks, cannot be said to have a tendency to show a normal mind on the part of the defendant. The record does not show as to what the defendant did, if anything, with reference to the cases pending against him for the issuance of worthless checks and it is not clear that he visited the office of the attorney in connection with the numerous charges of forgery against him. Under the circumstances, the state injected into this case proof of other criminal charges made against the defendant, without clearly showing action on the part

of the defendant with reference thereto, or the method adopted by him for the defense of charges against him. The allowance of such testimony in evidence under the circumstances was clearly prejudicial to the defendant.

III. Other matters stressed in brief are claimed to constitute prejudicial error, but since they are matters that would not appear to be likely to occur on another trial, we see no reason to prolong the opinion by discussion thereof.

The judgment of the lower court is reversed and the cause is remanded.

Reversed and remanded.

All the Justices concur.