338 So.2d 454 (1976)
Ronald GHOLSTON
v.
STATE.
8 Div. 698.
Court of Criminal Appeals of Alabama.
August 31, 1976.
Rehearing Denied October 12, 1976.
*455 Guin, Bouldin & Porch, Russellville, for appellant.
William J. Baxley, Atty. Gen., and Stephen M. Langham, Asst. Atty. Gen., for the State.
LEIGH M. CLARK, Supernumerary Circuit Judge.
Appellant was charged in a two-count indictment with murder in the first degree and robbery, allegedly occurring in Franklin County. The indictment was returned by a Franklin County grand jury, but on motion for a change of venue, the case was transferred to and tried in the Circuit Court of Madison County. The jury returned a general verdict finding defendant guilty as charged in the indictment and fixed his punishment at life imprisonment in the penitentiary. He was sentenced accordingly.
His subsequent timely motion for a new trial was overruled by the trial court.
The evidence shows without dispute that on the night of December 29, 1974, one Willie Washington, a taxi driver, was savagely murdered and robbed in Russellville, while answering a call for his services. His throat was cut by a sharp instrument, his body was left in the cab, and money that he had had on his person was taken from him. Two persons, who were seen in the back seat of the cab a short while before the crime was committed, were afterwards seen running from the direction of the cab after it had stopped with the body of the victim in it. It was and is the contention of the State that the two persons seen in the cab were appellant and one Charles Randolph, that they were the persons seen running from the cab and that they committed the crime. The case of Charles Randolph [1] has been before us on appeal from his conviction. We reversed and remanded because of error of the trial court in admitting in evidence testimony of witnesses showing that a witness for the State had made statements, prejudicial to defendant, inconsistent with his testimony on the trial. We noted in the opinion the impressiveness of argument of counsel questioning the sufficiency of the evidence and passed "to another day" a determination whether the evidence in this case justified the court in overruling defendant's motion to exclude the testimony, the refusal of affirmative charges requested in writing by the defendant and the overruling of defendant's motion for a new trial. Although the testimony in the case at hand is different in some respects from the testimony in Randolph, much of it is substantially the same, and the day has apparently arrived when we must make a determination, in the instant case at least, whether we must reverse the judgment for insufficiency of the evidence to withstand the mentioned motions and requests of defendant relative to the question of the sufficiency of the evidence, particularly defendant's motion for a new trial. The motion was partly grounded on alleged *456 insufficiency of the evidence and alleged, in one or more grounds, that the verdict was "not sustained by the great preponderance of the evidence."
Following the course taken in Randolph, the State relies largely, if not exclusively, upon the testimony of fifteen-year-old Josephine Harrison to establish the identity of the persons in the cab. We had some concern in Randolph whether the witness had been shown to be a court's witness, as distinguished from a State's witness, but in the present case it appears that after the witness had been called and interrogated by the court, out of the presence of the jury, defendant's counsel agreed with the State and with the court that she was then a court's witness. No point was made to the effect that her status as a court's witness had not been established, entitling either party to impeach her as if she were an adverse witness, as authorized by Peoples v. State, 257 Ala. 295, 58 So.2d 599. The same procedure was taken as to the witness Calvin Hurley, that is, he was treated as a court's witness, by express stipulation of counsel. He was not called by the State as a witness, as he was in Randolph.
In Randolph, the State announced its surprise at the testimony of Hurley after only a few questions had been asked him. This unquestionably explains the difference between the status of the witness Hurley as a witness in Randolph and as a witness in the case now before us.
The identity of the persons in the taxicab with the victim was the crucial issue in the case. There seems to be no question as to their being the persons who robbed and killed him, and that they were the same persons seen running from the cab immediately thereafter.
Josephine Harrison testified that on the night of the crime she was at the home of one Sue Hamm in Russellville; there had been a death in the family; there were about ten other people present. She and her boy friend, Tracy Hagler, left the house for a while and went to Tracy's nearby van. She saw the taxicab in which Washington was killed, with only the driver in it, going toward the Hamm house; it returned in about ten minutes. Her testimony continued:
"Q When the cab passed you coming back by, did you see anybody in the cab?
"A Yes.
"Q How many people were in the cab?
"A Three.
"Q And was there still a white person driving the cab?
"A Yes.
"Q Where were the other two people?
"A In the back seat.
"Q Were they white or black?
"A They were black.
"Q And you saw the cab come down here and you looked up and saw the cab stopped, is that right?
"A Um-hum.
"Q And then . . .
"Q Did you see anybody coming back up the road after you saw the cab stopped?
"A Um-hum.
"Q How many people did you see coming back up the road?
"A Two.
. . . . .
"Q Were they on the paved portion of the road?
"A Yes.
"Q Were they walking or running?
"A They were running.
. . . . .
"Q And you were parked there under that light?
"A Um-hum.
"Q And they never did leave the paved portion of the road, you could see them running down that part of the road?
"A Yes.
"Q Okay. Now, when they passed in front of the vehicle, did you recognize who it was?
"A Yes. I think I did.
"Q You think you did or do you know or are you sure you did, Ruby [Josephline]?

*457 "A I think I did.
"Q Have you ever testified before that you knew who they were and testified you knew that's who that you saw?
"A What?
"Q Have you ever testified before that you recognized the people and you knew who they were?
"A Um-hum.
"Q You have?
"A Um-hum.
"Q And you gave that statement to somebody?
"A Um-hum.
. . . . .
"Q Did you testify at that time that you knew who the boys were and that it was Ronald Gholston?
"A Um-hum.
"Q And Charles Randolph?
"A Um-hum.
"Q Did you say at that time that is who you thought it was?
"A Um-hum.
"Q Did you say that is who you thought it was?
"A I don't know. I guess.
"Q. Now,but you are saying you are not positive now, but you think that is who it was?
"A I guess.
. . . . .
"Q You say you think it was the defendant seated over there, Ronald Gholston, and Charles Randolph?
"A Um-hum.
"Q Did you see where they went?
"A No.
. . . . .
"Q You watched them run all the way up that road and watched them run in front of that cab and you never did look at them?
"A Yes. I was looking at them.
"Q Who was it that you saw that ran in front of the cab?
"A I don't know.
"Q You don't know?
"A Oh, I guess it was Ronald and Charles.
"Q You guess it was Ronald and Charles, referring to Ronald Gholston and Charles Randolph, is that right?
"A Um-hum.
. . . . .
"Q But you could see the cab and you did see the boys run in front of the van?
"A Yes."
. . . . .
During the testimony of Josephine Harrison she was questioned as to specific statements she had made wherein she had said that the two boys running back from the cab toward Sue Hamm's house were Ronald Gholston and Charles Randolph, that in the specific statements, including testimony before the grand jury, there was no "I think" or "guess" about her identification of the two. Included in such statements was a recording showing questions asked her and answers by her, which she identified out of the presence of the jury as her testimony "at a preliminary hearing . . . in Franklin County." The tape recording was first played back out of the presence of the jury, and thereafter it was played back in the presence of the jury. A portion of the tape as played back to the jury is as follows:
"Q What did the cab do after it left the Hamm house?
"A It rode down and stopped.
"Q Did you actually see the cab when it stopped.
"A Um-hum.
"Q What happened then when the cab stopped, please, ma'am?
"A Two boys got out of the cab.
"Q What did they do, where did they go?
"A They started running back down there to Sue Hamm's.
"Q And did you recognize who the two of them were?
"A Yes.
"Q Who were they, please, ma'am?
*458 "A GarryI mean Doug GholstonI mean Ronald Gholston and Charles Randolph."
According to the undisputed testimony, the robbery and murder of Washington took place about 11:20 P.M. The testimony of the dispatcher of the cab company furnishes the best evidence as to the exact time. He received a call to send a taxicab to Sue Hamm's house. At 11:05, Washington advised the dispatcher that he had unloaded a fare in Reed Town, another section of Russellville, and at that time the dispatcher gave him the message "to go to Sue Hamm's residence on South Carroll Street." It would have taken "anywhere from five to eight minutes" to go from where the passenger was unloaded in Reed Town to Sue Hamm's house."
Defendant testified that he was not at the scene or in the vicinity of the crime at the time the undisputed evidence shows that it was committed. He said he had been at Sue Hamm's house that night from about "a quarter to seven . . . until about nine thirty or something to ten," when he went to the home of Marvin Hill in Reed Town. Accompanying him was Charles Randolph, who arrived at the Hamm house about eight or eight-thirty; they stayed at Marvin Hill's house until about 11:30 or something to twelve," when he, Charles Randolph, and others left to go to Sue Hamm's. He testified that when they arrived in the vicinity of Sue Hamm's home, a group had arrived at the scene of the crime, which the automobile in which he was riding went around and went to Sue Hamm's house, where he and Charles Randolph got out of the automobile, and after he had "looked down at the commotion a while," he went inside the house, where there were several people, including Josephine Harrison. He said he never went out of the house that night, that he spent the night in the Hamm house, where he had spent the night before. He said that he learned upon entering the house that someone had been killed "and the police weren't letting anybody down there." He said that at no time that he was at the Hamm house did he hear anybody call for a taxicab.
The defendant was corroborated by some witnesses as to his whereabouts the night of the crime, including his presence in the home of Marvin Hill at the time of the commission of the crime and his journey from Hill's to the scene of the crime soon after its commission.
Defendant was not apprehended until about a week after the crime. There is no serious contention, however, that his late apprehension was due to any flight or similar conduct on his part.
Tracy Hagler, the boy friend of Josephine Harrison, who was sitting in the van with her at the time the taxicab went to Sue Hamm's and returned, testified as a witness for defendant. He said that he also saw the cab; at first only the driver was in it; the cab went toward the Hamm house; he saw the cab return from the direction of the Hamm house. He saw two black persons in the back seat of the cab. After the cab passed close to where the van was at the time, "the two boys or two men" came back running. This was about three minutes after the cab passed where he and Josephine were in the van. He testified that neither of the two was the defendant. He said that the two men or boys had "big Afros, way bigger than mine, and they were pretty big." He did not know either one of them. He said that the two persons were "bigger" and heavier than defendant. On cross-examination, he testified that he had made previous statements, particularly in testifying on the preliminary hearing, and that he had not stated that the two persons he saw had Afros; that his previous statements were to the effect that the only thing distinctive about either of the two men was that the one closest to him "had on dark clothes."
To determine whether the evidence is sufficient to uphold the judgment of the trial court, we must consider the testimony of Josephine Harrison, the only witness who identified defendant as one of the persons running from the scene of the crime to the home of Sue Hamm, in the light of the *459 established principle that the statements she made prior to her testifying as a witness on the trial of this case do not furnish substantive evidence of the guilt of defendant. In McElroy, Law of Evidence in Alabama, § 159.02(1), it is stated:
"A self-contradictory statement by a witness who is not a party, whether testified to by him on cross-examination or proven by others is not substantive evidence of the matter asserted, that is, such statement operates only to discredit the witness, and has no other effect; in particular, such statement cannot be the basis of a finding of a fact necessary to the establishment of liability or defense. Hamilton v. Browning, 257 Ala 72, 57 So 2d 530; Ferlise [Ferlesie or Ferlise] v Cook 201 Ala 571, 78 So 915; Thomas Furnace Co v Carroll, 204 Ala 263, 85 So 455; Lynn v State, 37 Ala App 400, 69 So 2d 485, syl 4; Lawson v State, 36 Ala App 438, 57 So 2d 643, syl 4; Anno: 133 ALR 1455."
The quoted statement was recently applied in Cloud v. Moon, 290 Ala. 33, 273 So.2d 196.
We are not here faced with the question of discreditation of the substance of the testimony of the witness but of the uncertainty of the witness as to what she testified. If the witness had testified that neither of the persons she saw running from the cab toward the house of Sue Hamm was defendant, if her testimony were blank on the question whether defendant was one of such persons, the State's case would fail, even though the State was able to show by the witness that she had made previous statements, some in the form of testimony, wherein she positively identified defendant as one of the persons. Such is not the case here, however. In her testimony, before any attempt to impeach her was made, she identified defendant as one of the persons. The fact that she did not positively identify him does not vitiate her testimony as to his identity. The hesitancy of a witness in identifying a defendant is a matter for consideration of the jury in passing upon the weight of such testimony. McCay v. State, 51 Ala.App. 307, 285 So.2d 117, cert. denied, 291 Ala. 788, 285 So.2d 122. Were it not for the testimony of Tracy Hagler that neither of the persons running from the scene of the crime was defendant, we would have a situation similar to the one described in Rodgers v. State, 27 Ala.App. 288, 171 So. 386, as follows:
"The corpus delicti was proven without dispute and the only question and issue was as to the identity of the person of the defendant. The crime was committed by two men, both of whom participated in the robbery. The evidence for the State tended to prove that this defendant was one of them. The evidence for the defendant tended to prove an alibi, but, as presented, the question was for the jury and, as we see it, the court committed no error in refusing to give at the request of the defendant the general affirmative charge."
We do not believe that the testimony of Tracy Hagler detracts from the testimony of Josephine Harrison in identifying defendant. The radical difference between his description of the two men and the physical characteristics of defendant, as well as Randolph, might tend to show that Josephine was lying in her identification of defendant, but it would not tend to show that she was mistaken. She would have had no occasion to have been lying against defendant. Her testimony is assailed by reason of her uncertainty at the time she testified on the trial. If the two men were as Hagler described them, it is unreasonable to say that Josephine mistook them for defendant and Randolph.
The fact that Josephine identified Randolph, as well as defendant, tends, we think, to strengthen her testimony as to identity. According to the undisputed evidence, Gholston and Randolph were together at the time, wherever they were. She would have had to have been mistaken as to the identification of each in order to clear either of guilt.
In considering the matter of the weight of the testimony, it is to be readily seen that testimony of defendant and others as to the time he left Marvin Hill's need only *460 to be in error by approximately 15-30 minutes to discredit his claim of an alibi.
There was substantial evidence of defendant's guilt, which justified the court's denial of defendant's motion to exclude the testimony and the court's refusal of the requested affirmative charges in favor of defendant. Furthermore, we are not convinced that the court was in error in overruling defendant's motion for a new trial. There is little, if any, indication of any prejudicial attitude on the part of the jury. The case was removed, on motion of defendant, from a county in which it was claimed that there could have been local prejudice. A trial court should not be held to have committed error in overruling a motion for a new trial unless the weight or preponderance of the evidence is so great against the verdict as to convince the court on appeal that the verdict is wrong and unjust. Swinney v. State, 225 Ala. 273, 142 So. 562; Curtis v. State, 226 Ala. 29, 145 So. 430; Johnson v. State, 51 Ala.App. 172, 283 So.2d 624.
Raised for the first time in Alabama is the question whether the offense of selling marihuana is a crime involving moral turpitude. The State was allowed to show, over the objection of defendant, that the witness Marvin Hill had been convicted of selling marihuana. Appellant zealously insists this was error.
The controlling statutory law is:
"No objection must be allowed to the competency of a witness because of his conviction for any crime, except perjury or subornation of perjury; but if he has been convicted of a crime involving moral turpitude, the objection goes to his credibility." Code of Alabama 1940, Tit. 7, § 434.
We fully realize that there can be, and almost certainly are, two opinions, each to some extent reasonable, upon the subject, but there is no middle ground for us at this time, and we can no longer "halt . . . between two opinions."
As the legislature has determined the type of crime that furnishes a basis for the impeachment of a witness if it can be shown that he has been convicted for such crime, the view of the legislature as to particular statutory crimes should be considered. Marihuana has been contraband in Alabama for forty-five years. Act No. 26, Ala. Acts 1931. At first, possession, sale, etc. was a misdemeanor. It was made a felony in 1951. Act No. 307, Ala. Acts 1951. Its inhibition is now found in the Alabama Uniform Controlled Substances Act, Code of Alabama Recomp. 1958, 1971 Cumulative Pocket Part, Tit. 22, § 258(25)-(60). By § 258(47), possession of marihuana for personal use only constitutes a misdemeanor only as a first offense, but as to a subsequent offense, it is a felony; a sale thereof constitutes a felony, for which the legislature has prescribed imprisonment in the penitentiary for not less than two nor more than fifteen years as punishment for the first offense; in addition, a fine of not more than $25,000 can be imposed. For a second sale, the sentence and the fine may be doubled. § 258(53). In Ledbetter v. State, 34 Ala.App. 35, 36 So.2d 564, cert. denied, 251 Ala. 129, 36 So.2d 571, it was firmly established, in the process of overruling previous Court of Appeals cases and distinguishing a previous Supreme Court case, that not all crimes punishable by imprisonment in a state penitentiary are necessarily crimes involving moral turpitude. The fact that the sale of marihuana is a felony does not make it a crime involving moral turpitude, but the fact that it is a felony, as well as the extent of the punishment prescribed by statute, is worthy of consideration on the question whether the crime involves moral turpitude. Furthermore, worthy of special consideration is the fact that marihuana is a Schedule I substance in that it has "high potential for abuse" and has "no accepted medical use in treatment in the United States." Tit. 22, §§ 258(28), 258(29)(d)(10).
Thus we find that our own Legislature which has the authority to classify crimes, has said that marihuana is a hallucinogenic substance and that the sale of it is so productive of harm that the one who sells is a *461 felon who deserves punishment, even for the first offense, of imprisonment in the penitentiary for not less than two nor more than fifteen years and is subject to an additional punishment in the form of a fine of not more than $25,000, unless the State Board of Health determines, which it has not determined, that it has accepted medical use in treatment in the United States. It is understood that it does not have accepted medical use in treatment in any of the United States.
"The mixture contains a drug not currently used in medicine but illegally used for pleasurable results." Enc. Americana, Marihuana, (1973)
"There is no established medical use for marihuana or any other cannabis preparation." Enc. International, Marihuana, (1974)
The principle that not all felonies involve moral turpitude has been given application to distilling. Marshall v. State, 207 Ala. 566, 93 So. 471. At the time it was so applied, the offense was proscribed by Act No. 7, Acts 1919, § 15, which made the offense a felony by prescribing the punishment as a sentence to the penitentiary for not less than one year or longer than five years. Other offenses under prohibition laws, including that of bootlegging of whiskey, have been held not to involve moral turpitude. Wiggins v. State, 27 Ala.App. 451, 173 So. 890. It is to be noted, however, that exceptions were made as to the possession and processing of prohibited liquor, and even the sale of it. The law was not applicable to the possession of "wine or cordial made from grapes or other fruit, when the grapes or other fruit are grown by the person making the same for his own domestic use, upon his own premises in the state. . . not exceeding five gallons for one family in twelve months," nor to the possession of "wine for sacramental purposes." Act No. 7, Ala. Acts 1919, § 2. The sale of grain alcohol could be made by retail druggists upon a prescription by a physician that it was for medicinal purposes. Act No. 7, Ala. Acts 1919, § 5.
Appellant relies heavily upon Pippin v. State, 197 Ala. 613, 73 So. 340 (1916), and Peters v. State, 240 Ala. 531, 200 So. 404 (1941). In Pippin, it was held that selling cocaine was not a crime involving moral turpitude. In so holding, the court took express note of the fact that it was a misdemeanor but did not hold that such fact was determinative of the question. Pippin was followed and applied in Peters to the violation of the Harmon Act, Code of Alabama 1940, Tit. 22, § 232, et seq., wherein the sale of cocaine and other specific narcotics was made a felony, but exceptions were expressly made to sales by druggists as prescribed by physicians under specified restrictive circumstances.
The Alabama Uniform Control Substances Act was coordinated with, and largely followed, the language of, the Federal Drug Abuse Prevention and Control Act of 1970. 21 U.S.C.A. § 801, et seq. Pertinent to the subject are Executive Orders No. 11599 and No. 11641. In No. 11599, June 17, 1971, 36 F.R. 11793, the President stated:
"Drug abuse has assumed alarming proportions in recent times and its spread must be reversed forthwith."
In No. 11641, January 28, 1972, 37 F.R. 2421, the first sentence is:
"The menace of drug abuse threatens to sap our Nation's strength and destroy our Nation's character."
Marihuana is listed in Schedule I, as it is in the Alabama statute. Neither under the federal statute nor under the Alabama statute has the substance been administratively reclassified.
If we are to consider Pippin and Peters as holding in effect that selling marihuana does not involve moral turpitude, we need go no further and would so hold here, but, as we see it, there are many distinguishing features between the crime of selling marihuana at the present time and the crime of selling narcotics at the time of Pippin and Peters, which justify our looking elsewhere for authority on the point. There are several cases elsewhere that hold that the sale of narcotics is a crime involving moral turpitude. *462 In re McNeese, 346 Mo. 425, 142 S.W.2d 33; Garlington v. Smith, 63 Ariz. 460, 163 P.2d 685; White v. Andrew, 70 Colo. 50, 197 P. 564. It has also been held that the violation of a particular section of the Harrison Anti-Narcotic Act does not constitute a crime involving moral turpitude. U.S. ex rel. Andreacchi v. Curran, D.C.N.Y., 38 F.2d 498, in which, however, it was said:
". . . I must distinguish between the crime for which he was sentenced and the acts which may have and probably did follow as a result of that crime. Very likely his omission to comply with the Harrison Anti-Narcotic Act enabled him to traffic in narcotics, and to commit acts which did involve moral turpitude; but I cannot now take into consideration those acts and their possible results. I must confine myself solely to determining whether the violation of the Harrison Act itself involves moral turpitude. . . . The crime consists not in engaging in narcotic traffic, but in merely failing to register, pay a tax and comply with certain regulations of the Internal Revenue Commissioner. It is to be regarded solely as a revenue act whatever incidental results might accompany its enforcement.. . ."
In State Board of Medical Examiners v. Friedman, 150 Tenn. 152, 263 S.W. 75, there was involved a violation of the Harrison Anti-Narcotic Act. The court remanded the case for a determination whether the particular conduct of defendant constituted a crime involving moral turpitude, holding that a violation of the Act did not per se involve moral turpitude. In so deciding, the court took into consideration the provision of the Act to the effect that a physician could lawfully prescribe and dispense drugs controlled by the statute. The court said:
"We think it conceivable that there might be a conviction under the Harrison Act which would show that the convicted physician had been guilty of acts involving `moral turpitude' when he violated the federal statute in question.
"Thus, suppose it should be shown that the convicted physician was in fact a mere drug peddler, preying on the necessities of that unfortunate class known as `drug addicts.' The record of the conviction, in such case, might indicate a high degree of `moral turpitude.'"
A relatively recent case in which it was held that unlawfully possessing and selling drugs was a crime involving moral turpitude within the meaning of the term in a particular statute is John's Vending Corp. v. Secretary of Revenue, Cigarette Tax Bd., Dept. of Revenue, 3 Pa.Cmwlth. 658, 284 A.2d 834, 837, in which it was said:
". . . Further, however individuals may feel concerning the morality of personal use of drugs, the `common sense' of contemporary society is that the illegal sale of drugs is base, vile, depraved and a grave offense against public morals.. . ."
However we may feel as to the quoted statement, whether it goes too far in branding persons guilty of illegal sales of drugs as guilty of crimes involving moral turpitude and thus brand some selling occasionally for the good that the drugs would do under the particular circumstances, we can hardly disagree with it when applied to a hallucinogenic illegal substance, which in the eyes of the law has no redeeming feature, such as marihuana. There are those that believe that the possession of marihuana should be decriminalized; there are those that robustly advocate that the punishment is too severe. Their position, however, is not in accord with the law on the subject. Neither they nor anyone else can reasonably contend that, assuming the law is correct in its design and in the extent of punishment provided, the sale of marihuana is not base, vile, depraved and a grave offense against public morals.
In our opinion, the court was not in error in overruling defendant's objection to the question to the witness sought to be impeached as to his conviction for the sale of marihuana. To hold that such is not a crime involving moral turpitude would be incompatible with the expressed view of our *463 Legislature, the constitutionality of the statute as to punishment is not being inhibited as cruel or unusual, and in the view of the great majority of the public generally who do not subscribe to the view of those who clamor for a change in the law as to marihuana.
We are unable to hold that the court committed reversible error in overruling defendant's objection to argument for the prosecution that is not set out in the transcript of the proceedings. The vague implications of what State's counsel argued as contained in defendant's counsel's objections are insufficient for us to hold that the argument was improper. Argo v. State, 282 Ala. 509, 213 So.2d 244; Canady v. State, 55 Ala.App. 473, 316 So.2d 720; Cassady v. State, 51 Ala.App. 544, 287 So.2d 254.
We have considered all questions raised by appellant and have examined the record to determine whether there is any error therein prejudicial to defendant and have found none. The judgment is due to be affirmed.
The foregoing opinion was prepared by Supernumerary Circuit Judge Leigh M. Clark, serving as a judge of this Court under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
TYSON, HARRIS, DeCARLO and BOOKOUT, JJ., concur.
CATES, P.J., dissents.
CATES, Presiding Judge (dissenting).
I think § 434 is contrary to early Common Law. Hence, it must be strictly construed. Wigmore, Evidence (3rd Ed.) § 519 et seq.
Cocaine is a far more harmful substance. Pippin, supra, being a decision of the Alabama Supreme Court controls us.
NOTES
[1] Randolph v. State, Ala.Cr.App., 331 So.2d 766.