Rape, first degree; life imprisonment.
The victim in this case was seven years old at the time of the incident. She testified that, in August, 1981, she lived with her mother at 51 Johnson Homes in Dothan, Alabama. On Sunday, August 30, 1981, she left her aunt's house with appellant and went to her mother's house. They watched television for awhile, then she went to her room, put on her nightgown, and went to sleep.
The victim stated that she was later awakened by appellant who took off her nightgown and "got her bootie." When asked to point out what she meant by "bootie," the child pointed to her vagina. She acknowledged that the appellant put his private parts inside her "bootie," it hurt and she cried. Afterwards she saw blood on the sheets. The appellant also touched her on the "butt." When asked to point out what she meant by "butt," the victim indicated her posterior. She was told not to tell anyone or the appellant would *Page 1277 
"whop" her. He then went into the living room and she went back to sleep.
The victim testified that the next day she told her aunt and grandmother what had happened. About a week after this incident she went to the hospital where she was examined by a doctor.
On cross-examination, the child denied that her grandmother or the assistant district attorney had told her what to say. She responded affirmatively to several questions by defense counsel as to whether "bootie" meant "butt" or "behind" and acknowledged that she had told another little girl, Tabitha Whaley, that the appellant did not do this to her.
During re-direct examination, the victim stated that she told Tabitha that the appellant did not do this to her because she was "scared." When the prosecutor again asked her to point out what she meant by "bootie," the child again pointed to her vagina.
On re-cross-examination, the victim answered affirmatively when defense counsel asked her if "bootie" means "your butt" and if the appellant "got your behind," "got your bootie," and "got your butt."
Sgt. Gary Kinney of the Dothan Police Department testified that around 12:15 P.M. on September 7, 1981, he was called to the emergency room of the Southeast Alabama Medical Center where he talked with the seven-year-old victim, her aunt, one Russell Snell, and the examining doctor. After she was treated, the victim, her aunt, and Snell went to the police station with Kinney and he obtained statements from them. Kinney then telephoned an assistant district attorney and obtained an authorization for a warrant.
According to Kinney, he then went to the residence of the victim's grandmother where he talked with her and again with Snell. He requested Snell to make a telephone call to 51 Johnson Homes and, "if anyone answered the phone, just to hang up." Snell complied with this request in Kinney's presence. Kinney, accompanied by several officers, then proceeded to 51 Johnson Homes. It took only two to three minutes to travel from the grandmother's house to 51 Johnson Homes. Upon arriving, the officers knocked on the door of the apartment several times, each time announcing that they were police officers. When no one answered, they obtained a key from the Dothan Housing Authority and entered the apartment where they found appellant and arrested him. This was between 3:10 and 4:00 P.M.
The officers seized several items at the time of the arrest, including a yellow flowered sheet found soaking in a bucket of bleach, a yellow sheet found in a washing machine, and a sheet and pillowcase containing a reddish stain found on the twin bed in the back bedroom. These items were later delivered to the crime lab in Enterprise.
The day following appellant's arrest, Kinney obtained a court order requiring appellant to submit to tests for venereal disease and to allow samples to be taken from him needed for a "Sex Crime Kit." On September 9, 1981, Kinney took appellant to the Houston County Health Department where Joseph Ellington performed a test for venereal disease. Kinney then took appellant to the Southeast Alabama Medical Center where samples for a "Sex Crime Kit" were taken.
On cross-examination, Kinney testified that he seized the sheets in the apartment because the victim described them in her statement.
Joseph Ellington testified that he was employed by the Houston County Health Department in the V.D. control section. He examined appellant pursuant to a court order and prepared a culture plate to be used in testing for venereal disease. He treated appellant with Benemid and Ampicillin.
According to Ellington, the most prominent form of transmission of gonorrhea is through sexual contact. Outward symptoms of the disease usually manifest themselves in a male between three and seven days after contact with an infected person. He stated that a person may have gonorrhea *Page 1278 
and be asymptomatic, showing no outward, physical symptoms of the disease.
On cross-examination, Ellington acknowledged that, at the time he examined the appellant, no physical symptoms of gonorrhea were found. Further, there are no tests which can determine whether a patient is asymptomatic or when or how a person contracted gonorrhea.
Paula Landigan, a microbiologist and the director of the Dothan branch laboratory of the State Department of Public Health, testified that she performed certain tests, including a Graham Stain, on the culture taken from appellant. The results of the tests were "positive presumptive" for gonorrhea, meaning that appellant presumptively had the disease. Landigan stated that the testing procedure is ninety-five percent accurate and acknowledged that the same tests were performed on the victim's mother with the results being negative.
Dr. Michael Johnson testified that he examined the victim on September 7, 1981. A pelvic examination revealed multiple abrasions around the genitals that were old, an abnormal amount of vaginal discharge, and that the hymen was missing. Dr. Johnson stated that he took a sample of the discharge and prepared a slide for a Graham Stain and a culture plate. Various identification information was attached to these items and they were then sealed and sent to the hospital lab. Johnson received the results of the Graham Stain approximately forty-five minutes later and then treated the victim for gonorrhea.
On cross-examination, Johnson stated that he had done a complete physical examination of the victim and that there was no physical evidence of violation of the rectum.
Linda Adams testified that she was a medical technologist employed in the lab of the Southeast Alabama Medical Center. She stated that the hospital has a medical computer system and explained that when a physician orders a test from the emergency room, a nurse or receptionist puts the order into the computer system along with information about the patient. The order and information are then received on another computer system in the lab.
At 12:59 P.M., on September 7, 1981, Adams received through the computer a request from Dr. Johnson to perform a Graham Stain on a slide labelled with the victim's name. She performed the test and reported the results to the emergency room at 1:30. Adams stated that specimens such as the slide involved here, are delivered to the lab reception area by emergency room personnel. Only hospital personnel have access to the laboratory. She testified that the slide bearing the victim's name was sealed when she received it. Adams stated the results of the test in hypertechnical language.
Dr. Johnson was recalled and testified that, based on his examination of the victim and the lab report, he concluded that there was sufficient evidence to treat the victim for gonorrhea.
The State rested and appellant's motion to exclude was overruled.
Charles F. Brooks, a crime lab analyst with the Alabama Department of Forensic Sciences, testified for the defense. He examined the stains on the sheets found in the apartment at 51 Johnson Homes, but tests did not reveal the presence of blood or semen. On cross-examination, Brooks stated that the test to determine the presence of blood or semen would be affected if the sheets had been machine washed or soaked in bleach.
Nine-year-old Tabitha Whaley testified that she was "sort of" a friend of the victim. During a conversation the victim told her that appellant "didn't do nothing to her and that her grandmother made it up." Further, the victim told her not to tell anyone.
During cross-examination, Tabitha stated that she and the victim were no longer good friends, even though she had told the assistant district attorney prior to trial that they were still good friends. She also acknowledged that on the day of her conversation with the victim "all the kids [at *Page 1279 
school] were asking her questions about what happened and kidding her about that."
The appellant testified in his own behalf. He stated that he had lived with the victim's mother, Ruby Brown, for three years and that the victim had lived with them for the last two and one-half years. According to appellant, Ruby left for Jacksonville, Florida on August 27, 1981, and he saw the victim at her aunt's house around 7:45 P.M. on August 30. She went to the apartment at Johnson Homes and spent the night there alone with him, but appellant denied committing any sexual assault on her.
According to appellant, the last time he had sexual relations with Ruby Brown was August 27, 1981. He had sexual relations with other women on September 4, 6, and 7.
On cross-examination, appellant stated that he soaked the sheets in the bucket because he did not know how to use the washing machine. He acknowledged that he had written letters, after his arrest, to the victim's mother and grandmother requesting them not to pursue the charges and to tell the district attorney that they would not testify. He also admitted that he had been previously convicted of felony possession of marijuana.
A social worker testified that she placed the victim in her grandmother's custody on August 31, 1981, and the victim did not tell her of the alleged rape at that time.
The victim's grandmother, Janette Brown, denied threatening to have appellant arrested if he did not give her custody of the victim and her brother. Further, she stated that sometime after Sunday, August 30, appellant told her that he was going to take the victim and her younger brother and go to Florida.
Appellant testified that around August 28, the grandmother called him and requested that the children be brought to her. When he refused, she told him she was going to call the police and make trouble. She called three more times and threatened to have him arrested, but he did not report these incidents.
 I
Appellant contends that the trial court erred in overruling his motion to exclude. He argues that the State did not prove the essential element of sexual intercourse and therefore failed to make out a prima facie case of rape.
Section 13A-6-60 (1), Code of Alabama 1975, defines "sexual intercourse" as follows: "Such term has its ordinary meaning and occurs upon any penetration, however slight; emission is not required."
The victim testified that the appellant put his private parts inside her "bootie." Appellant insists that she interpreted "bootie" to mean her "butt" or "behind" and therefore his alleged conduct would have been "deviate sexual intercourse" as defined in § 13A-6-60 (2), which is not an element of rape. Although the child responded affirmatively to defense counsel's leading questions that "bootie" meant "butt" or "behind," the record clearly shows that when she was asked on two separate occasions to point to her "bootie," she pointed to her vagina. Moreover, her physical condition as described by Dr. Johnson distinctly indicated sexual intercourse as defined by §13A-6-60 (1). In fact, Dr. Johnson stated that his examination revealed no physical evidence of a violation of the victim's rectum. Therefore, we are of the opinion that the State established a prima facie case of rape. See Beckley v. State,353 So.2d 542 (Ala.Cr.App. 1977).
Appellant points out that the victim had previously told another child that the appellant did not do this to her. A prior inconsistent statement may be explained by a witness.Johnson v. State, 49 Ala. App. 356, 272 So.2d 282 (1972). The victim explained that she made this statement because she was "scared." The matter of the prior inconsistent statement and the victim's explanation as to why she made it could have been considered by the jury in determining her credibility, but did not affect *Page 1280 
the State's presentation of a prima facie case.
 II
Appellant maintains that the evidence was insufficient to support his conviction for first degree rape.
In the present case the evidence presented by appellant was in conflict with that presented by the State. It is well settled that conflicting evidence presents a jury question,Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied,387 So.2d 283 (Ala. 1980), and "[a] verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust." Johnson v. State, 378 So.2d 1164
(Ala.Cr.App.), cert. denied, 378 So.2d 1173 (Ala. 1979). It is our judgment that the evidence in this case was sufficient to sustain the verdict.
 III
The appellant insists that the chain of custody for the medical slide containing the victim's discharge sample was not established and the trial court committed reversible error in allowing testimony as to the results of the test performed on the slide.
"The purpose in establishing a chain of custody is to show a reasonable probability that the [evidence] was not tampered with." Bell v. State, 339 So.2d 96 (Ala.Cr.App. 1976). In our opinion, the evidence established a "reasonable certainty that there had been no substitution, alteration, or tampering with" the slide. Oliver v. State, 399 So.2d 941 (Ala.Cr.App. 1981). Moreover, the lab technician's testimony concerning the results of the test performed on the slide was so technical in nature it is doubtful that its admission was harmful to appellant.[1]
 IV
Appellant claims that the results of the gonorrhea tests performed on him were inadmissible because the tests were the result of an unlawful, warrantless arrest in violation of his Fourth Amendment rights.
A hearing was held prior to trial on appellant's motion to suppress. Sgt. Kinney testified essentially as he did at trial. In addition, he stated that he learned, in talking to the victim's grandmother and aunt, that appellant intended to leave for Florida either the night of September 7 or very early the morning of September 8. He further stated that he could not obtain an arrest warrant on September 7 because the courthouse was closed for Labor Day.
The appellant testified that he was arrested on September 7, 1981 at 51 Johnson Homes. He stated that although his name was not on the lease, he considered the apartment to be his residence, he had been living there for six months, he had all his clothes there, and he had made an effort to help pay the rent.
On cross-examination, he denied hearing the phone ring before the police officers arrived and also denied hearing the officers knocking at the door.
The circuit clerk of Houston County, Julia L. Trant, testified that she had the authority to issue arrest warrants for Houston County, Alabama. She stated that although it was not a common practice, she had on occasion issued arrest warrants when the courthouse was closed.
Appellant cites Payton v. New York, 445 U.S. 573,100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), in support of his position that his arrest was unlawful. In Payton, a majority of the United States Supreme Court held that the Fourth and Fourteenth Amendments prohibit warrantless and non-consensual *Page 1281 
entry by police officers into a suspect's home to make a routine felony arrest, even though probable cause exists. This holding, however, was qualified by the term "absent exigent circumstances." 445 U.S. at 590, 100 S.Ct. at 1382.
In Dorman v. United States, 140 U.S.App.D.C. 313,435 F.2d 385 (1970), the D.C. Court of Appeals set out the following factors which it deemed relevant in determining whether the circumstances in a given case are sufficiently exigent to permit a warrantless entry and arrest:
 "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect `is reasonably believed to be armed,' (3) `a clear showing of probable cause . . . to believe that the suspect committed the crime,' (4) `strong reason to believe that the suspect is in the premises being entered'; (5) `a likelihood that the suspect will escape if not swiftly apprehended'; and (6) `the peaceful circumstances of the entry.'" United States v. Reed, 572 F.2d 412 (2d Cir. 1978) (quoting Dorman, supra).
Examining these factors in the present case, we are of the opinion that exigent circumstances did exist to justify the warrantless arrest of appellant in his home. Although appellant was not armed, there is substantial evidence to show that each of the other factors was present. Also, the arrest was made during daylight, and whether the arrest was made during the day or at night is an additional consideration in determining the reasonableness of an arrest. Dorman, supra; United States v.Campbell, 581 F.2d 22, n. 5 (2d Cir. 1978). The fact that Kinney might have been able to obtain a warrant had he located Ms. Trant does not alter our finding that exigent circumstances existed. Cf. Dorman, supra, (where neither the judge who normally issued warrants, nor the part-time commissioner was readily available, the court found exigent circumstances existed even though the parties stipulated that over one hundred other judges also had the authority to issue a warrant).
Not only was appellant's arrest lawful, but the gonorrhea test was performed pursuant to a court order. See Schmerber v.California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Therefore the admission of the test results was proper.
 V
Appellant argues that the trial court abused its discretion in denying his motion for new trial because a juror failed to answer truthfully a question propounded to the venire. The members of the venire were asked, "Have any of you or your close friends or relatives ever been the victim of any type crime?" The record shows that juror Albert Reynolds, Jr., made no response to that question.
At the hearing on the motion for new trial, Reynolds' niece testified that she had been raped and that the trial of her attacker was held the same week her uncle was on jury duty. Although she stated that she saw her uncle in "the court,"[2] on cross-examination she testified that he did not see her. She had not discussed her case with Reynolds, nor even with her own father. To her knowledge, there were no articles in the newspaper about her case.
Albert Reynolds testified that, at the time of appellant's trial, he did not know that his niece had been the victim of rape. Further, he had seen his brother and sister-in-law only once in the three or four months prior to appellant's trial and he never told them he had been summoned for jury duty.
Reynold's brother testified that neither he nor his wife had told Albert Reynolds that their daughter had been raped. Further, he stated that Albert Reynolds had not told him that he had been summoned for jury duty the week of December 14, 1981. *Page 1282 
In Knighten v. State, 402 So.2d 363 (Ala.Cr.App. 1981), we find the following:
 "Although the defendant has a right to have questions answered truthfully on voir dire examination of the venire, the failure of a juror to make a proper response to a question regarding his qualifications as a juror does not automatically entitle the defendant to a new trial. The proper inquiry is whether the defendant's rights were prejudiced by the juror's failure to properly and correctly respond."
The testimony given at the hearing on the motion for new trial clearly shows that juror Reynolds had no knowledge at the time of appellant's trial that his niece had been raped. Therefore, this fact could not in any way have prejudiced appellant's rights.
Moreover, the decision on a motion for new trial rests within the sound discretion of the trial court. Hewitt v. State,389 So.2d 157 (Ala.Cr.App. 1980). In reviewing the trial court's ruling, this court will indulge every presumption in favor of its correctness. Smith v. State, 393 So.2d 529 (Ala.Cr.App. 1981). We find no showing of abuse of discretion in this case.
 VI
The appellant asserts that felony possession of marijuana is not a crime involving moral turpitude and the trial court erred in allowing the assistant district attorney to use that conviction for impeachment purposes.
In Gholston v. State, 338 So.2d 454 (Ala.Cr.App. 1976), this court held that the sale of marijuana is a crime involving moral turpitude. Two years later we held that misdemeanor possession of marijuana is not a crime involving moral turpitude, but left unanswered the question of whether felony possession of marijuana involved moral turpitude. Luker v.State, 361 So.2d 1124 (Ala.Cr.App.), cert. dismissed,361 So.2d 1127 (Ala. 1978).
Several factors were considered by this court in Gholston in determining that the sale of marijuana was a crime involving moral turpitude. The first of these was the fact that the offense is a felony. While all felonies do not necessarily involve moral turpitude, "the fact that [a crime] is a felony, as well as the extent of the punishment prescribed by statute, is worthy of consideration on the question whether the crime involves moral turpitude." Gholston, supra. Felony possession of marijuana is punishable by a minimum of two years imprisonment for amounts less than 2.2 pounds, § 20-2-70 (a), Code of Alabama 1975, and a minimum of three years imprisonment plus a $25,000 fine for amounts over 2.2 pounds, § 20-2-80, Code of Alabama Supp. 1982.
Another consideration in Gholston was the fact that marijuana is a Schedule I drug with a high potential for abuse. Marijuana remains a Schedule I drug under both the Alabama Uniform Controlled Substances Act and the Federal Controlled Substances Act, 21 U.S.C.A. § 812 (c) (1981), and continues to be a major public health problem in the United States, with wide-spread use and abuse. See generally, National Institute on Drug abuse, Marijuana and Health (1982).
We also noted in Gholston that marijuana has no accepted medical use. Appellant points out that the Alabama legislature has recently passed the Controlled Substances Therapeutic Research Act allowing experimentation on the use of marijuana in the treatment of glaucoma and to alleviate the side effects of cancer chemotherapy. Ala. Code § 20-2-111 (Supp. 1982). Although the legislature has condoned certain limitedexperimentation for the possible medical uses of marijuana, it is clear that the substance still has no accepted medical use. The Secretary of Health and Human Services stated recently:
 "The IOM report summarizes evidence concerning possible therapeutic effects of marijuana or its constiuents in treating several medical disorders, including most notably glaucoma and the nausea induced by cancer chemotherapy. In each instance, the findings are described *Page 1283 
as preliminary. It is reported that marijuana and delta-9THC often produce troublesome psychotropic or cardiovascular side effects that limit their therapeutic usefulness, particularly in older patients. It is concluded that the greatest therapeutic potential probably lies in the use of synthetic analogues of marijuana derivatives with higher ratios of therapeutic to undesirable effects. It should be emphasized that possible therapeutic benefits in no way modify the significance of the negative health effects of marijuana." Marijuana and Health, supra at 5. [Emphasis added]
Appellant argues that felony possession differs from sale of marijuana because selling marijuana is automatically a felony while possession may be a misdemeanor offense. Misdemeanor possession of marijuana is, however, a one-time exception and exists only for marijuana held for "personal use." Ala. Code §20-2-70 (a) (1975); Roberts v. State, 349 So.2d 89
(Ala.Cr.App.), cert. denied, 349 So.2d 94 (Ala. 1977). Felony possession connotes either a subsequent offense, which may give rise to an inference that the defendant has a blatant disregard for the law, or possessing marijuana other than for personal use, which may give rise to an inference that it is held for sale.
After reviewing all the considerations discussed above, we are of the opinion that felony possession of marijuana is a crime involving moral turpitude.
For the reasons stated above, the judgment of conviction by the Houston Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.
[1] The lab technician stated that as a result of her testing she "reported out 3+ WBC, white blood cells, 1+ Intracellular Graham negative diplococci." When asked to explain this in laymen's terms, she said: "In layman's terms, the 1+ is a quantitation of how much bacteria you see on the slide. And, the Intracellular Graham negative diplococci, based on what I have seen on numerous occasions, looks like G.C. and is confirmed with the culture."
[2] It was never established whether "the court" referred to either the courtroom in which her case was tried or the courtroom in which appellant was tried, or to the courthouse generally.